IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 12, 2000 Session

## STATE OF TENNESSEE v. DONALD L. CULBREATH and GENNA McCALLIE

**Appeal By Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 96-13497, 97-00667, -72, -73, -75     L.T. Lafferty, Judge**

---

**No. W1999-01553-SC-R11-CD - Filed October 20, 2000**

---

We granted this appeal to determine: 1) whether the trial court abused its discretion by disqualifying a District Attorney General and his staff due to the use of a private attorney to assist the prosecution where the private attorney received substantial compensation from a private, special interest group and 2) whether the trial court properly dismissed the indictments based on a violation of due process. The Court of Criminal Appeals affirmed the trial court's ruling regarding disqualification but held that the appropriate remedy for the due process violation was suppression of the evidence and not dismissal of the indictments. We agree that the prosecution's appointment and use of a private attorney who received substantial compensation from a private, special interest group created a conflict of interest and an appearance of impropriety that required disqualification of the District Attorney General's office. We further conclude that the prosecutor's use of the private attorney under the circumstances of this case violated the defendants' right to due process under the Tennessee Constitution and required dismissal of the indictments. Accordingly, the judgment of the Court of Criminal Appeals is reversed in part and the judgment of the trial court is reinstated.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals**
**Reversed In Part; Judgment of the Trial Court Reinstated.**

E. RILEY ANDERSON, C. J., delivered the opinion of the court, in which ADOLPHO A. BIRCH, JR. and JANICE M. HOLDER, JJ., joined. WILLIAM M. BARKER, J., filed a concurring opinion. FRANK F. DROWOTA, III, not participating.

Frierson M. Graves, Jr., and Thomas E. Hansom, Memphis, Tennessee, for the defendants, Donald Culbreath and Genna McCallie.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy P. Weirich and Jennifer S. Nichols, Assistant District Attorneys General, for the State of Tennessee.

# OPINION

## BACKGROUND

The trial court conducted an extensive evidentiary hearing on the issues and set forth detailed findings of fact and conclusions of law in a 22-page order. We shall summarize the relevant events based on the entire record, as well as the trial court's findings.

In December of 1995, Larry Parrish, an attorney in Memphis, Tennessee, was approached by the executive director of an organization known as the Citizens for Community Values, Inc., ("CCV"), who asked him to meet with two Shelby County assistant district attorneys, Amy Weirich and Jennifer Nichols, regarding the prosecution of obscenity cases. Parrish, a former Assistant United States Attorney, was experienced in the prosecution of obscenity cases.

Parrish met with Weirich and Nichols for three hours. When they asked for his help, Parrish replied, "I haven't been asked." On the following day, then-Shelby County District Attorney John Pierotti contacted Parrish and requested his assistance. Pierotti told Parrish that his office could not pay for Parrish's services but could reimburse expenses. When Parrish asked if he could be compensated by outside sources, Pierotti agreed. According to Parrish, "that's how it got started."

Thereafter, Parrish conducted an extensive investigation into sexually-oriented businesses in Shelby County, Tennessee, with the assistance of two assistant district attorneys, an investigator from the District Attorney General's office, and investigators from the Tennessee Bureau of Investigation and the Department of Revenue. Parrish met with these employees in his law firm office on a daily basis for several months. Beginning in January of 1996, the group's investigation consisted of conducting surveillance of sexually-oriented establishments and taking statements from a large number of witnesses. Although Parrish testified that it was "understood" that General Pierotti had the ultimate decision-making authority, there were no procedures or guidelines establishing Parrish's specific duties or Pierotti's oversight.

The initial agreement called for the District Attorney General's office to pay for expenses incurred during the investigation, but Parrish began to pay expenses from contributions by CCV and numerous members of the community. Parrish testified that CCV received a monthly statement itemizing his time and expenses, just as any other client. Parrish's expenses included the use of court reporters to take statements,[1] a TV/VCR, copying and courier expenses, video monitors, special telephone lines, and various office supplies and equipment. The expenses were paid from CCV contributions. From December of 1995 to July of 1996, Parrish accumulated over 2,400 hours in the investigation. His fee was approximately $212,000 and expenses totaled over $34,000.

---

[1] Parrish preferred the more expensive practice of using court reporters for this purpose, whereas the practice of the District Attorney General's office was simply to use tape recorders.

On July 11, 1996, Parrish was "appointed" as a "Special Assistant District Attorney" by General Pierotti and was administered an oath of office for the first time. On the same day, a civil nuisance suit seeking injunctive relief against several sexually-oriented businesses was filed in Shelby County Chancery Court. The civil complaint was signed by Parrish as "Special Assistant District Attorney General," District Attorney General Pierotti, and two assistant district attorneys.

At Pierotti's request, Parrish was appointed as additional counsel in matters relating to the civil cases in chancery court by Governor Don Sundquist on August 30, 1996. The letter of appointment noted that Parrish would not be compensated by the State, that Parrish would disclose the amount and source of any compensation received, that such information was a matter of public record, and that Parrish was under the direct supervision of General Pierotti.

When Pierotti resigned, effective November 1, 1996, his successor, William Gibbons, continued to work with Parrish in the investigation and prosecution of sexually-oriented businesses. In addition to the civil nuisance suit already filed in chancery court, Gibbons sought criminal indictments from the grand jury. In December of 1996, the grand jury returned an 18-count indictment against the defendant, Donald L. Culbreath, and a 22-count indictment against the co-defendant, Genna McCallie.[2] On July 31, 1997, the Governor appointed Parrish as additional counsel in the pending civil cases and the pending criminal indictments.

The trial court found that over a 19-month period, Parrish received $410,931.87 for his services from CCV and other private contributors between December of 1995 and July of 1997. Of this amount, Parrish's expenses exceeded $100,000.

The trial court found that Parrish's substantial involvement in the prosecution of these cases and his "enormous" compensation from a private, special interest group created a conflict of interest that required Parrish's disqualification.[3] The trial court also determined that the conflict of interest created an appearance of impropriety that required disqualification of the District Attorney General and his office. The trial court concluded that these actions violated the defendants' right to due process and dismissed the indictments.

The Court of Criminal Appeals held that the trial court did not abuse its discretion in disqualifying Parrish and the entire District Attorney General's office based on the appearance of impropriety. The court agreed that the defendants' right to due process had been violated, but suggested that the appropriate remedy was suppression of the evidence and not dismissal of the indictments.

We granted this appeal to review these important questions.

---

[2] The charges against Culbreath included ten counts of promoting prostitution, six counts of prostitution, and two counts of public indecency. The charges against McCallie included ten counts of promoting prostitution, six counts of prostitution, four counts of public indecency, and two counts of presenting live obscene performances.

[3] The State has not appealed this part of the trial court's ruling.

## DISQUALIFICATION

The State contends that the trial court's disqualification of the District Attorney General and his staff was improper because there was no conflict of interest and no appearance of impropriety. The State argues that the District Attorney maintained control over the prosecution and that the interests of the prosecution and Parrish were identical. The defendants maintain that the trial court properly disqualified Parrish and the entire District Attorney General's office.

### Standard of Review

In determining whether to disqualify a prosecutor in a criminal case, the trial court must determine whether there is an actual conflict of interest, which includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of "compromising interests and loyalties." See Tenn. R. Sup. Ct. 8, EC 5-1. If there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety. See Tenn. R. Sup. Ct. 8, EC 9-1, 9-6.

If disqualification is required under either theory, the trial court must also determine whether the conflict of interest or appearance of impropriety requires disqualification of the entire District Attorney General's office. See State v. Tate, 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995). The determination of whether to disqualify the office of the District Attorney General in a criminal case rests within the discretion of the trial court. Appellate review of such a ruling is limited to whether the trial court has abused its discretion. See id. at 550.

### The Role of Prosecutor

A District Attorney General is an elected constitutional officer whose function is to prosecute criminal offenses in his or her circuit or district. Ramsey v. Town of Oliver Springs, 998 S.W.2d 207, 209 (Tenn. 1999); Tenn. Const. art. VI, § 5. The District Attorney General "[s]hall prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto . . . ." Tenn. Code Ann. § 8-7-103(1) (1993 and Supp. 1999). The prosecutor's discretion to seek a warrant, presentment, information, or indictment is extremely broad and subject only to certain constitutional restraints. Ramsey, 998 S.W.2d at 209.

The proper role of the prosecutor in our criminal justice system has been addressed on numerous occasions by various courts and ethical rules.[4] As early as 1816, the Tennessee Supreme Court said that a prosecutor

---

[4] See Fred Zacharias, Structuring the Ethics of Prosecutorial Trial Practice: Can Prosecutors Do Justice, 44 Vand. L. Rev. 45 (1991); George T. Frampton, Jr., Some Practical and Ethical Problems of Prosecuting Public Officials, 36 Md. L. Rev. 5 (1976).

is to judge between the people and the government; he is to be the safeguard of the one and the advocate of the rights of the other; he ought not to suffer the innocent to be oppressed or vexatiously harassed any more than those who deserve prosecution to escape; he is to pursue guilt; he is to protect innocence; he is to judge of circumstances, and, according to their true complexion, to combine the public welfare and the safety of the citizens, preserving both and not impairing either.

Fout v. State, 4 Tenn. (3 Haywood) 98 (1816).  The United States Supreme Court has said that a prosecutor:

is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 2d 1314 (1935).

These principles are likewise embodied within the ethical considerations of the Model Code of Professional Responsibility governing the conduct of prosecutors:

The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict.  This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts.

Tenn. R. Sup. Ct. 8, EC 7-13; see ABA Standards for Criminal Justice, Standard 3-1.1(c) (1979) ("[T]he duty of the prosecutor is to seek justice, not merely to convict.").  The Model Code also discusses the differences in the role of the prosecutor from that of the private attorney:

With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice; the prosecutor should make timely disclosure to the defense of available evidence, known to the prosecutor, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence

merely because the prosecutor believes it will damage the prosecutor's case or aid the accused.

Tenn. R. Sup. Ct. 8, EC 7-13.

In short, public prosecutors hold a unique office in our criminal justice system. Contrary to the State's contention on appeal, prosecutors are expected to be impartial in the sense that they must seek the truth and not merely obtain convictions. They are also to be impartial in the sense that charging decisions should be based upon the evidence, without discrimination or bias for or against any groups or individuals. Yet, at the same time, they are expected to prosecute criminal offenses with zeal and vigor within the bounds of the law and professional conduct. See Berger, 295 U.S. at 88, 55 S. Ct. at 633.

## Private Prosecutors

Under English common law, the criminal justice system required the victim of a criminal offense, or the victim's family, to initiate and pursue criminal proceedings. See State v. Peterson, 218 N.W.2d 367, 369 (Wis. 1928). Although the development and role of the public prosecutor in the United States over the past several centuries has largely supplanted the English common law in this regard, many jurisdictions still allow a private attorney to be retained or appointed to assist in the prosecution of a criminal case. See John D. Bessler, The Public Interest and the Unconstitutionality of Private Prosecutors, 47 Ark. L. Rev. 511, 515 (1994).

Numerous courts and commentators have recognized, however, that the use of a private attorney in the prosecution of a criminal case may present ethical dilemmas, including conflicts of interest. Bessler, 47 Ark. L. Rev. at 548-49 (and cases cited therein). The private attorney must comply with the standards and ethical responsibilities for a public prosecutor – to not merely seek convictions but also to pursue justice. See Young v. United States ex rel. Vuitton Et Fils S.A., 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987). At the same time, however, the private attorney's ethical duty "both to client and to the legal system, is to represent the client zealously within the bounds of the law, which include Disciplinary Rules and enforceable professional regulations." Tenn. R. Sup. Ct. 8, EC 7-1.[5]

In Tennessee, there are two statutes pertaining to the prosecutor's use of additional counsel. One, which the parties agree is not applicable in this case, permits the victim of a crime or the victim's family to retain an attorney to assist in the trial of a criminal case under the supervision of the District Attorney General. Tenn. Code Ann. § 8-7-401 (Supp. 1999). The second, which the parties contend is applicable here, provides for the employment of additional counsel:

---

[5] Indeed, this tension in creating dual roles has led several courts to hold that the use of a private attorney as a prosecutor violates due process. See Bessler, 47 Ark. L. Rev. at 548-49.

**Employment of additional counsel.**— In all cases where the interest of the state requires, in the judgment of the governor and attorney general and reporter, additional counsel to the attorney general and reporter or district attorney general, the governor shall employ such counsel, who shall be paid such compensation for services as the governor, secretary of state, and attorney general and reporter may deem just, the same to be paid out of any money in the treasury not otherwise appropriated, upon the certificate of such officers certifying the amount to the commissioner of finance and administration.

Tenn. Code Ann. § 8-6-106 (1993).

Although the statutory provisions in Tennessee, similar to the laws in other jurisdictions, purport to address the potential conflicts by requiring that the private attorney work under the supervision of the District Attorney or be compensated by the state, they do not foreclose the risk that a conflict of interest, or appearance of such a conflict, may exist under the circumstances of a particular case. For example, there is a conflict of interest whenever an attorney is retained to assist the prosecution and acquires a direct financial interest in the proceeding. See State v. Eldridge, 951 S.W.2d 775, 781 (Tenn. Crim. App. 1997) (attorney assisted prosecution but also represented victim in a corresponding civil action). Moreover, an actual conflict or an apparent conflict may exist anytime a lawyer cannot exercise his or her independent professional judgment free of "compromising influences and loyalties." See Tate, 925 S.W.2d at 534 (district attorney formerly served as judge presiding over defendant's case); Tenn. R. Sup. Ct. 8, EC 5-1.[6] Accordingly, a court must review the facts and circumstances of each case with these standards in mind.

In this case, Parrish's involvement began without any formal appointment by the Governor and no oath of office, and it continued in this manner for eight months from December of 1995 to July 1996. Parrish was compensated for his services by a private, special interest group that he billed each month. During this time, Parrish spearheaded a comprehensive investigation with a "staff" that included two assistant district attorneys and three investigators. There was no specific agreement or arrangement as to Parrish's role, the extent of his participation, or the extent of District Attorney General Pierotti's supervision – for all practical purposes, there appeared to be little supervision or control by Pierotti.

In July of 1996, a civil nuisance suit seeking injunctive relief was filed by Parrish and the District Attorney General's office against the defendants based on the evidence from Parrish's investigation. Although General Pierotti purportedly appointed Parrish as a special prosecutor on

---

[6] See also Tenn. R. Sup. Ct. 8, DR 5-105 (a lawyer should refuse to accept or continue employment if the interest of another client may impair the exercise of "independent judgment"); Tenn. R. Sup. Ct. 8, EC 5-2 (a lawyer should not accept employment if there is a reasonable probability that personal interest will "affect adversely the advice to be given or services rendered the prospective client"); Tenn. R. Sup. Ct. 8, EC 5-14 ("independent professional judgment" is compromised when a lawyer is asked to represent two or more clients with differing interests).

the same day the suit was filed, there was (and is) no constitutional or statutory authority for such an appointment to be made. Moreover, although Parrish was later appointed as additional counsel by the Governor, there was (and is) no legal authority allowing Parrish to be compensated on an hourly basis by a private, special interest group. See Tenn. Code Ann. § 8-6-106 (1993) (counsel may be compensated from the state treasury). Indeed, the State now concedes that Parrish's appointment and participation was "problematic" inasmuch as there was no statutory authority for it in this manner.

Accordingly, we agree with the lower courts that Parrish had an actual conflict of interest under the circumstances of this case. He was privately compensated by a special interest group and thus owed a duty of loyalty to that group; at the same time, he was serving in the role of public prosecutor and owed the duty of loyalty attendant to that office. Moreover, because Parrish was compensated on an hourly basis, the reality is that he acquired a direct financial interest in the duration and scope of the ongoing prosecution. In short, the dual role was such that Parrish could not exercise his independent professional judgment free of "compromising influences and loyalties." See Tenn. R. Sup. Ct. 8, EC 5-1.

The State contends that there was no conflict of interest because Parrish and the prosecution had the same interest – eradicating sexually-oriented businesses. The prosecutor's discretion about whom to prosecute and to what extent they should be prosecuted, however, is vast and to a large degree, not subject to meaningful review. See Ramsey, 998 S.W.2d at 209; State v. Superior Oil, Inc., 875 S.W.2d 658, 660 (Tenn. 1994) ("prosecutorial discretion in the charging process is very broad"). Moreover, as the United States Supreme Court has recognized, the prosecutor's discretion goes beyond initial charging decisions:

> A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of a court.

Young, 481 U.S. at 807, 107 S. Ct. at 2137. In sum, the State's argument misses the point that the foundation for the exercise of the vast prosecutorial discretion is freedom from conflict of interest and fidelity to the public interest.

Finally, we agree that the trial court did not abuse its discretion in disqualifying the District Attorney General's staff based on the appearance of impropriety created by Parrish's conflict of interest. As one commentator has said:

> To ensure and maintain public confidence in the integrity of the government, public officials, including prosecutors, must act impartially and responsibly. Government

officials must be held to high ethical standards to make certain their activities are conducted in the public's interest. Furthermore, 'governments have a responsibility to the public to avoid even the appearance of impropriety and to act to reduce the opportunities and incentives for unethical behavior by their officials and employees.' This is true of the prosecuting attorney because 'an appearance of impropriety on the part of a government attorney will inevitably harm not only the individual attorney, but also the entire system of government that allows such improprieties to take place.'

Roberta K. Flowers, <u>What You See Is What You Get: Applying the Appearance of Impropriety Standard to Prosecutors</u>, 63 Mo. L. Rev. 60, 68 (1998) (citations omitted).

Contrary to the State's argument, the record supports the trial court's finding that Parrish played a substantial role in the prosecution and that there was "a blurring between an actual conflict of interest and the appearance of impropriety arising in conflicts of interest." Despite Parrish's extensive contact with the office of the District Attorney General, including daily working involvement with two assistant district attorneys and several investigators, there were no guidelines as to Parrish's duties and no efforts to screen Parrish from other members of the District Attorney General's office. Both District Attorney General Pierotti and his successor, District Attorney General Gibbons, knew that Parrish was being compensated by a private, special interest group. Moreover, the trial court found that on one occasion, Pierotti, Gibbons, and Parrish attended a fund-raiser which "stressed the necessity to continue on with the prosecution of criminal activity in topless clubs and the need for continued donations to pursue these goals."

We further agree with the trial court's finding that Parrish's extensive involvement had a substantial impact on the prosecution. Although the State argues that the investigation into sexually-oriented businesses preceded Parrish's involvement, it was the investigation led by Parrish that resulted in the filing of a civil nuisance suit seeking injunctive relief. Moreover, when District Attorney Gibbons took office, he not only was aware of Parrish's investigation but also made the decision to seek criminal indictments against the defendants. Accordingly, we conclude that Parrish's conflict of interest tainted the entire prosecution and that the trial court did not abuse its discretion in disqualifying Parrish and the District Attorney General and his office.

## DISMISSAL OF INDICTMENT

The defendant argues that the Court of Criminal Appeals erred in reinstating the indictments that had been dismissed by the trial court. The State maintains that neither dismissal of the indictment nor suppression of the evidence – a remedy suggested by the Court of Criminal Appeals – is appropriate under the facts of this case.

We initially observe that dismissal of an otherwise valid indictment returned by a grand jury is a little-used remedy for prosecutorial misconduct. <u>See</u> <u>United States v. Williams</u>, 504 U.S. 36, 54, 112 S. Ct. 1735, 1746, 118 L. Ed. 2d 352 (1992). It may be appropriate, however, where

prosecutorial misconduct denies a defendant the constitutional right to due process. See United States v. Carrasco, 786 F.2d 1452, 1455 (9th Cir. 1986); People v. Torres, 613 N.E.2d 338, 340 (Ill. App. 1993). Moreover, dismissal of an indictment may be appropriate under a court's general supervisory authority where prosecutorial misconduct, while short of constitutional error, has prejudiced a defendant or affected the charging decision by the grand jury. Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988).

A citizen has the right to due process of law under the Fourteenth Amendment to the United States Constitution and under the "law of the land" provision of article I, section 8 of the Tennessee Constitution. As we have often observed, "United States Supreme Court interpretations of the due process clauses of the United States Constitution only establish a minimum level of protection, and this Court, as final arbiter of the Tennessee Constitution, is always free to expand the minimum level of protection mandated by the federal constitution." Burford v. State, 845 S.W.2d 204, 207 (Tenn. 1992); see also City of White House v. Whitley, 979 S.W.2d 262, 268 (Tenn. 1998) ("Although we may not restrict the protections afforded by the federal constitution, we may interpret the Tennessee Constitution to impose higher standards and stronger protections").

We have recognized on several occasions that "due process . . . calls for such protections as the particular situation demands." Wilson v. Wilson, 984 S.W.2d 898, 902 (Tenn. 1998); Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993). In making this determination, a court must consider three factors:

> (1) the private interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Wilson, 984 S.W.2d at 902.

In Wilson, we held that due process was not violated when a private attorney who represents the beneficiary of a court order in a civil case prosecutes a criminal contempt action for a violation of that order. In analyzing the three relevant factors, we noted that the defendant has a liberty interest at stake in a contempt action but that the risk of deprivation of that interest was minimal because it is the trial court – and not the private attorney – who determines whether a contempt action will proceed. Moreover, the rule governing contempt actions, Tenn. R. Crim. P. 42(b), provides for extensive judicial oversight and protections that minimize the risks associated with the involvement of private counsel. Finally, we noted that fiscal and administrative burdens would be great if contempt actions arising out of court orders in civil cases could be prosecuted only by the District Attorney General. Wilson, 984 S.W.2d at 903.

The circumstances of this case warrant the opposite result. The defendants' liberty interests are obviously significant, as they have been charged with multiple felony offenses. We also believe, for the reasons already described, that the risk of erroneous deprivation of these interests, i.e.,

prejudice to the defendants, stemming from the participation of a private attorney compensated by a special interest group, is also substantial. In short, the participation of a privately funded prosecutor rendered the proceedings fundamentally unfair. Finally, unlike Wilson, the fiscal and administrative burdens are minimal because the District Attorney General and his staff are already charged with the responsibility of investigating and prosecuting the offenses in question. Indeed, two assistant district attorneys were directly involved in the investigation of these cases along with Parrish. Given these factors, we agree with the lower courts that the defendants were denied their right to due process.

Although dismissal of an indictment is not a usual remedy, we conclude that dismissal of the indictment is appropriate in this case.[7] In Gill v. State, 134 Tenn. 591, 597 (1915), for example, we held that dismissal of an indictment would have been the appropriate course of action where a prosecutor presented charges to a grand jury while at the same time representing the victim's family in a corresponding civil action. Similarly, another court has observed that "a dismissal may . . . preserve fairness to the individual defendant, . . . deter prosecutorial misconduct, or . . . protect judicial integrity." Carrasco, 786 F.2d at 1455. Here, the private attorney's conflict of interest tainted the entire prosecution of the case well before the charges were presented to the grand jury. Accordingly, we conclude that the proceedings were inherently improper and that dismissal of the indictments is the appropriate remedy to redress the constitutional error.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in disqualifying the District Attorney General's office and that the indictments were properly dismissed based on the denial of the defendants' right to due process under article I, section 8 of the Tennessee Constitution. Costs of the appeal are taxed to the State of Tennessee.

_____

E. RILEY ANDERSON, CHIEF JUSTICE

---

[7] Given the inherent and pervasive nature of the misconduct, we reject the suppression of evidence remedy suggested by the Court of Criminal Appeals. The conflict of interest and resulting misconduct permeated the entire prosecution and rendered the proceedings as a whole fundamentally unfair. Under these circumstances, dismissal of the indictments, and not suppression of the evidence, is the appropriate remedy.