# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 10, 2015 Session

## STATE OF TENNESSEE v. JARQUESE ANTONIO ASKEW

### Appeal from the Criminal Court for Davidson County
#### No. 2013A829  Monte Watkins, Judge

_____

### No. M2014-01400-CCA-R3-CD- Filed December 29, 2015

_____

Defendant, Jarquese Antonio Askew, was indicted by the Davidson County Grand Jury in a three-count indictment with first degree premeditated murder, felony murder, and especially aggravated robbery. Prior to trial, Defendant filed a "Motion to Recuse Prosecuting Attorney." Following a hearing, the trial court denied Defendant's motion. A jury convicted Defendant of the lesser-included offenses of facilitation of voluntary manslaughter in Count 1 and criminally negligent homicide in Count 2, and Defendant was convicted as charged in Count 3 of especially aggravated robbery. The trial court merged Count 2 into Count 1 and sentenced Defendant to three years in Count 1 and 17 years in Count 3, to be served concurrently. In this appeal as of right, Defendant asserts that the trial court erred by denying his motion to disqualify the prosecutor, and Defendant challenges the sufficiency of the convicting evidence. Having carefully reviewed the record before us and the briefs of the parties, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. CAMILLE R. MCMULLEN, J., concurred in results only.

Manuel B. Russ, Nashville, Tennessee, for the Appellant, Jarquese Antonio Askew.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## *Facts*

The victim's father, Anant Patel, testified that he and his wife, Chhaya Patel, owned a gas station where the victim worked. On October 25, 2010, Mr. Patel went to the victim's apartment because the victim did not arrive at work when he was scheduled to arrive. Mr. Patel saw the victim's car parked outside his apartment, and he knocked on the victim's door. The victim did not answer, and Mr. Patel opened the door and found the victim's body lying on the floor.

The victim's mother testified that the victim worked at their gas station, and they paid him in cash. They also gave him cash to purchase items for the store. At the time of the victim's death, he was in possession of a large amount of cash because he had not yet purchased certain items for the store. She also testified that the victim wore a gold necklace and a diamond ring. She testified that she could not find the jewelry after the victim's death. Ms. Patel also knew the victim carried a gun because he routinely possessed large amounts of cash. She testified that he kept many of his expensive possessions in the living room.

Officer Travis Zander responded to the victim's apartment. When he arrived, another officer and the victim's parents were present. The victim's door was unlocked and there were no signs of forced entry. The victim's body was partially blocking the door. It was "very visibly, severely injured." The victim was "[c]overed in blood all over his face and his body." Officer Zander observed spent cartridge casings on the floor. The living room furniture "had been flipped, or torn apart."

Officer Felicia Evans testified that the victim lived in a gated apartment complex. Visitors had to be granted access to the complex by a resident. The victim's apartment was located on the third floor of the apartment building. Officer Evans took photographs of the crime scene and collected evidence. Officer Evans found several shell casings and a projectile under and around the victim's body. Investigators found a Ruger gun case in a drawer inside the victim's closet, but no gun was found inside the box. A receipt inside the case showed that the victim purchased a 9 millimeter pistol on January 6, 2010. Two other receipts showed that the victim purchased a .22 caliber rifle and a Ruger .380 caliber pistol on June 2, 2010, and he purchased two more weapons on June 3, 2010.

A note was found under the windshield wiper of the victim's car. The note read, "I need my cash ASAP." Two .22 caliber shell casings were also found inside the victim's car.

2

Cody Davio had been friends with the victim for ten years at the time of the victim's death. Mr. Davio lived in the same apartment complex as the victim. Mr. Davio saw the victim on October 24, 2010. He took the victim home sometime between 9:00 and 10:00 p.m. While Mr. Davio was with the victim, he heard the victim tell someone on the phone to bring his gun back to him. Mr. Davio knew that the victim owned guns, as well as a laptop, a Play Station 3, a gold necklace, and a watch.

Clint Campbell testified that Michael Allen and a person he later identified as Defendant came to his house and asked if he wanted to buy an iPad and a Sony Vaio laptop computer. Mr. Campbell did not purchase the items because they did not have the chargers.

Sergeant Andrew Injaychock was the lead investigator in the case. Sergeant Injaychock took an inventory from the victim's mother of items that were missing from the victim's apartment. The items included a Playstation 3, an Apple iPad, an iPhone 3, two laptop computers, a laptop carrying case, a Blackberry cell phone, a Bose radio, two purses, a watch, $5,000 cash, a gold and diamond "chain ring," a Cannon camera, a Ruger 9 millimeter handgun, a Smith and Wesson .22 caliber handgun, and a Century Arms 223 firearm.

Sergeant Injaychock interviewed Defendant at Defendant's mother's residence. Defendant stated that he met the victim through a female named Evie. The victim showed Defendant a .22 caliber handgun with an attached silencer and agreed to let Defendant hold the gun for a day. Defendant failed to return the gun to the victim, and Evie told Defendant that the victim had threatened "to shoot up [Defendant's mother's] house" if Defendant did not return the gun to the victim. Defendant stated that he asked Michael Allen to drive him to the victim's apartment to return the gun. He stated that they entered the gated apartment complex by following another car through the gate. Defendant stated that Allen told him to "give [him] the gun" before they entered the apartment. Defendant gave the gun to Allen and told him that he "didn't want nothing to go down." Defendant stated that they did not intend to rob or shoot the victim. While they were in the apartment, "a little argument broke out." Defendant stated that the victim went to the door to leave. The victim raised his shirt up and turned around, and Allen started shooting. Defendant did not see the victim with a gun. Defendant stated that Allen fired several shots at the victim, and the victim fell on the floor in the doorway. Allen told Defendant to take the victim's laptop, cell phone, and an M-16 rifle that was propped against the television in the living room. Defendant took the items and ran out of the apartment. Defendant waited outside for Allen to come. Defendant stated that it was raining outside, and he waited for Allen for ten to fifteen minutes. After they left, Allen "acted normal," and they listened to music in Allen's car. Defendant stated that Allen kept the items that were stolen from the victim's apartment. Defendant denied that

3

he was with Allen when Allen tried to sell the stolen items. Michael Allen was arrested and charged in the incident. Allen had a prior criminal history. Defendant told investigators he did not contact the police about the incident because he did not want to "be a snitch."

Defendant was subsequently interviewed by Hugh Coleman, an investigator with the District Attorney General's Office, and his statement was reduced to writing and signed by Defendant. Defendant's statement was mostly consistent with his previous statement. Defendant stated that the victim was wearing a white t-shirt at the time of the shooting. Investigators confronted Defendant with information that the victim was not wearing a shirt at the time of the shooting, but Defendant maintained that the victim was wearing a shirt, and Defendant did not know how the victim's shirt was removed. Investigator Coleman testified that he examined the victim's shirt and found no bullet holes in his shirt.

Tennessee Bureau of Investigation Agent Shelly Betts examined ten shell casings recovered from the crime scene. She determined that the shell casings were all fired from the same weapon. Agent Betts also examined photographs of the crime scene, which depicted the location where the shell casings were found, and she determined that the shooter was standing close to the victim when some of the shots were fired.

Deputy Chief Medical Examiner Adele Lewis, of the Metro-Nashville Davidson County Medical Examiner's Office, performed an autopsy on the victim. Dr. Lewis testified that the victim died as a result of multiple gunshot wounds to the head and torso. Dr. Lewis did not find any soot or stippling around the wounds, indicating that the shooter was more than three feet away from the victim at the time the shots were fired.

*Analysis*

*Disqualification of the Assistant District Attorney General*

Defendant contends that the trial court erred by denying his motion to disqualify the prosecuting attorney because the prosecutor had interviewed Defendant in preparation for its case against Michael Allen. The State responds that the trial court properly denied the motion because no conflict of interest or appearance of impropriety existed.

The trial court conducted a hearing on Defendant's motion. The hearing consisted only of the arguments of counsel. No testimony or other evidence was presented. Additionally, we note that the technical record does not contain the entire motion, but only the first page, which ends mid-sentence, and the last page, which contains only the certificate of service and signature line. Nevertheless, the arguments of counsel at the

4

hearing on the motion and the parties' briefs are sufficient to allow for appellate review of the issue.

At the hearing, defense counsel asserted that the same prosecuting attorney in this case had interviewed Defendant while preparing the State's case against Allen, and that Allen was indicted based on Defendant's statements. Defense counsel stated that the charges against Allen were subsequently dismissed, and defense counsel argued, "it is problematic for the State then to have the same prosecuting attorney turning around and prosecuting [Defendant]." Defense counsel argued,

> I think that this could potentially prejudice the jury towards [Defendant], which of course would be in violation of his due process rights, because the jury could think that [the prosecutor]'s charging decisions were involved in the investigation somehow makes her arguments, or increases the validity and truthfulness of her arguments by sort of vouching for the decision making process that led to [Defendant]'s charge in the first place.

The prosecutor responded that the decision to prosecute or not prosecute Allen was not a relevant jury consideration, and the State did not intend for evidence of the State's charging decisions to be presented at trial. Defense counsel argued that the jury would hear evidence that Allen was charged because to exclude that evidence would limit Defendant's "right to present to the jury any alternate theory of the crime that we choose to [present], so I don't think that that is going to be kept out of the jury's decision making process."

The trial court made the following ruling on the motion:

> Well, it's really kind of a close call, I'll tell you. I know that prosecutors get involved in their cases. This is slightly different in that you had one person charged previously and then had that charge dismissed and then the, quote, witness, then becomes charged with the offense. So that adds a different kind of wrinkle to the situation.
>
> But, you know, as long as her personal involvement is kept out of it, I think that it can go forward. But, you know, it may not be the best practice to prosecute a case under these similar factual situations because I think it can cause some difficulty.

Initially, we note that improper or unethical participation by a prosecutor or a prosecutor's office in a criminal case may implicate the basic constitutional rights of a

5

defendant, "the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession[,] and the interests of the public at large. . . ." *State v. Phillips*, 672 S.W.2d 427, 435 (Tenn. Crim. App. 1984); *see also State v. Coulter*, 67 S.W.3d 3, 28-29 (Tenn. Crim. App. 2001), *abrogated on other grounds by State v. Merriman*, 410 S.W.3d 779, 793 (Tenn. 2013). In protecting these concerns, Tennessee courts generally turn for guidance to our Code of Professional Responsibility, as adopted by our supreme court in Tennessee Supreme Court Rule 8, and to court-created principles of professional conduct. *Coulter*, 67 S.W.3d at 28.

It is well-established that a trial court's ruling on the disqualification of an attorney and of the entire office is reviewed under an abuse of discretion standard. *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000). For purposes of deciding whether a prosecutor or his office should be disqualified from participation in a criminal case, this court and our supreme court have adopted the following analytical framework: (1) Do the circumstances of the defendant's case establish an actual conflict of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified? *Culbreath*, 30 S.W.3d at 312-313.

In determining whether there is an actual conflict of interest, the trial court must determine whether the prosecutor cannot exercise his or her independent professional judgment free of "compromising interests and loyalties." *See id.*, 30 S.W.3d at 312; *see also* Tenn. Sup. Ct. R. 8, RPC 1.7, 1.8, 1.9(c). "An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." *State v. Tate*, 925 S.W.2d 548, 552 (Tenn. Crim. App. 1995). A test for determining a disqualifying conflict in that situation is whether the attorney "made a choice between possible alternative courses of action [that were] helpful to one client but harmful to the other." *Id.* at 552-53 (citations omitted). "The term has been described as a situation in which regard for one duty tends to lead to [the] disregard of another." *Id.* (citations omitted). Once an actual conflict of interest is shown, disqualification is the appropriate remedy. *See Moran v. State*, 472 S.W.2d 238, 239-40 (Tenn. Crim. App. 1971).

If there is no actual conflict of interest, the court must nonetheless consider whether the conduct in question created an appearance of impropriety. *See Clinard*, 46 S.W.3d at 186-87; see also Tenn. Sup. Ct. R. 8, RPC 1.10. The appearance of impropriety must be real, reflect an objective public perception rather than the subjective and anxious perceptions of the litigants, and reflect the views of a layperson with a knowledge of all the facts. *Id.* "In sum, an appearance of impropriety exists in those

situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." *Id*. (internal citations and quotations omitted).

Defendant effectively concedes in his brief that no actual conflict of interest existed here, recognizing that the prosecutor did not represent two or more parties with divergent interests. However, Defendant contends that the prosecutor's actions gave an appearance of impropriety. Defendant asserts that the prosecutor should have informed him that he may be subject to prosecution and "dispel[led the] notion" that Defendant's statements would only be used to prosecute Allen. Defendant suggests that it was unethical of the prosecutor to participate in an interview of "an unrepresented, non-party to the legal action" and that Defendant effectively waived his rights when he "sp[oke] with members of the DA's office under the guise that he was merely a witness for the State and not a suspect subject to later indictment based on his statements in trial preparation." The State responds that there is no evidence in the record that the prosecutor told or led Defendant to believe that she would act in his best interest or represent him.

We note that Investigator Coleman, who interviewed Defendant on behalf of the District Attorney General's Office, testified at trial that the statements made by Defendant in that interview were substantially the same as the prior statement Defendant gave to Sergeant Injaychock. Both statements were voluntarily given and Defendant was not in the custody of the State at the time of the interviews. At trial, Investigator Coleman testified that he contacted Defendant and asked for a meeting. Defendant met with Investigator Coleman, Investigator David Zocola, and the prosecuting attorney in this case at the District Attorney General's Office on December 6, 2011. The interview was not recorded and lasted approximately one hour. Investigator Coleman testified that he and Investigator Zocola asked Defendant questions. Defendant's statement was reduced to writing, and Defendant signed the statement on January 5, 2012.

Defendant analogizes this case to *Clinard v. Blackwood*, which involved the disqualification of a law firm. In that case, our supreme court held that disqualification was required where an attorney who had represented one party to a lawsuit later accepted employment with the law firm that represented the opposing party in the same lawsuit. 46 S.W.3d at 184. The court noted that a "substantial relationship" existed because the attorney's involvement in the prior case was so extensive that his employment with his new law firm could be "regarded as a changing of sides." *Id*.

Unlike *Clinard*, this case does not involve "a changing of sides." The function of the office of the District Attorney General "is to prosecute criminal offenses in his or her

7

circuit or district." *Culbreath*, 30 S.W.3d at 313; *see also* T.C.A. § 8-7-103(1) (providing that each District Attorney General shall prosecute "all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto"). As part of this function, "the District Attorney General has the inherent duty under the law of Tennessee to investigate all infractions of the public peace and acts which are against the peace and dignity of the [s]tate." *State v. Elrod*, 721 S.W.2d 820, 822 (Tenn. Crim. App. 1986). Accordingly, a prosecutor's participation in the investigation of a case will not disqualify the prosecutor from subsequent participation in the prosecution of the case. *See Id*. at 822; *State v. Randy Lee Ownby*, No. M2007-01367-CCA-R3-CD, 2009 WL 112582, *9-10 (Tenn. Crim. App., Jan.14, 2009). "The actions of [the Assistant District Attorney General] in the investigation of this case, including the interrogation of the defendant following his arrest, were a part of his sworn and required duties as an Assistant District Attorney General." *Elrod*, 721 S.W.2d at 822.

We conclude that the trial court did not abuse its discretion in denying Defendant's motion. Accordingly, Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant contends that the evidence at trial was insufficient to sustain his convictions for especially aggravated robbery and facilitation of voluntary manslaughter. Specifically, Defendant asserts that the State failed to prove beyond a reasonable doubt that Defendant was criminally responsible for the conduct of another. We conclude that the evidence is sufficient to support his convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

8

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. *Id.*

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2).

Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." *Id.* (citing *Ball*, 973 S.W.2d at 293). To prove a defendant's guilt under the theory of criminal responsibility, the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[ ] in the commission of the crime.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). Criminal responsibility for the actions of another person "requires that a defendant act with a culpable mental state, specifically, the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997) (quoting T.C.A. § 39-11-402(2)). "A person acts with intent as to the nature or result of conduct when it is that person's

9

conscious objective or desire to engage in the conduct or cause the result." *Id*. (citing T.C.A. § 39-11-302(a); *Maxey*, 898 S.W.2d at 757).

Defendant challenges the sufficiency of the evidence to support his conviction for especially aggravated robbery. Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Especially aggravated robbery is a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2)[w]here the victim suffers serious bodily injury." T.C.A. § 39-13--403(a).

Defendant asserts that he did not possess the requisite intent to commit robbery. Defendant contends that the evidence established that Allen instructed Defendant to take property from the victim's apartment, that Defendant was fearful of Allen, and that Defendant did not benefit from the proceeds of the theft. The State responds that the evidence established that Defendant knowingly and intentionally participated in the robbery.

The evidence showed that after Allen shot the victim, Defendant took items from the victim's residence without permission. Defendant then waited outside in the rain for ten or fifteen minutes beside Allen's car, waiting for Allen to exit the apartment. Defendant did not call for help or report the crime to authorities until police located him. A witness testified that Allen and Defendant attempted to sell him a Sony Vaio laptop, and a Sony Vaio laptop was stolen from the victim. Based on the proof, the jury reasonably could have concluded that Defendant knowingly and intentionally participated in the robbery. We conclude that the evidence is sufficient to support Defendant's conviction for especially aggravated robbery.

Defendant also challenges the sufficiency of the evidence to support his conviction for facilitation of voluntary manslaughter. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211. The jury is responsible for reviewing the evidence to determine whether it supports a finding of adequate provocation. *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001). As relevant here, a person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A person acts knowingly when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-302(b). One is "criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a).

10

In summarizing the evidence to support Defendant's conviction for facilitation of voluntary manslaughter, the State failed in its brief to point to any evidence in the record that Allen was adequately provoked and that he acted "in a state of passion." Having carefully reviewed the evidence, we find minimal evidence to support a finding of passion produced by adequate provocation, a requisite element of voluntary manslaughter. Accordingly, this issue is a close issue. We recognize, however, that the question of whether an act is committed under adequate provocation is a question of fact for the jury, *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

We conclude that the evidence is sufficient to suggest that Allen was adequately provoked by the victim. In the light most favorable to the State, the evidence shows that Defendant and Allen went to the victim's apartment armed with the victim's gun. According to Defendant's statement, the victim had made previous threats against Defendant's family. Defendant gave the gun to Allen before entering the victim's apartment. Defendant stated that "a little argument broke out," but Defendant did not state whom the argument was between, how long the argument lasted, or what the argument was about. Defendant also stated "a little commotion broke off," but it "wasn't that serious." The victim went to the door and told Defendant and Allen to leave. Defendant stated that the victim then pulled up his shirt, and Allen began shooting the victim. Investigators testified that the apartment was in disarray, and the couch was torn apart. Investigators found several shell casings around the victim's body, which suggests that Allen was standing in close proximity to the victim at the time of the shooting. From all of this, we conclude that the jury could have inferred that Allen acted in the heat of passion after adequate provocation from the victim.

In order to support a conviction for facilitation of voluntary manslaughter, the proof also has to establish that Defendant knowingly furnished substantial assistance to Allen. Again, the evidence of facilitation is subtle, but as the adjudicators of fact, the jury could reasonably have concluded that Defendant and Allen went to the victim's apartment with the intent to rob the victim, and although they did not intend to shoot the victim, once inside the apartment, a fight broke out, and Allen shot the victim in a state of passion after adequate provocation. Defendant then took items from the victim's apartment as instructed by Allen and waited outside for Allen with the stolen items. Significantly, Defendant did not seek help or contact the police after the victim's shooting. Defendant only confessed his involvement in the crimes after he learned that police were trying to contact him as part of their investigation. Therefore, we conclude that evidence existed that reasonable minds could accept as to the offense of facilitation of voluntary manslaughter.

11

For the foregoing reasons, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, PRESIDING JUDGE