IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson May 6, 2008

## STATE OF TENNESSEE v. JASON CLINARD

**Appeal from the Circuit Court for Stewart County**
**No. 4-1650-CR-05     George Sexton, Judge**

**No. M2007-00406-CCA-R3-CD - Filed September 9, 2008**

A Stewart County Circuit Court jury convicted the defendant, Jason Clinard, of first degree premeditated murder and imposed a sentence of life imprisonment. *See* T.C.A. §§ 39-13-202(a)(1); -204 (2006). In this appeal, the defendant asserts that the trial court erred by (1) not suppressing photographs of the victim, (2) allowing the State an independent psychological examination of the defendant, (3) failing to disqualify the District Attorney General's Office, and (4) following the statutory sentencing scheme that resulted in the defendant's life sentence. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J. delivered the opinion of the court, in which DAVID H. WELLES, J., and DAVID G. HAYES, SR. J., joined.

Worth Lovett, Clarksville, Tennessee, for the appellant, Jason Clinard.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On March 2, 2005, the 14-year-old defendant shot and killed his school bus driver, Joyce Gregory, as she sat aboard the bus in front of his house. On the day before the shooting, the victim had reported to the vice-principal of Stewart County High School, where the defendant was a freshman, that the defendant had been "dipping snuff on the bus." As a result of the victim's report, the defendant received "in-school suspension." The evidence established that the March 1, 2005 incident was not the first time the defendant had violated the school bus rules. He had previously been suspended from riding the bus for fighting and had only returned to riding the bus on February 25, 2005. According to the defendant's 16-year-old nephews, Joseph and Bobby Lee Fulks, the defendant believed that the victim was "picking on him" and he "didn't like [the victim] too much."

On the morning of the shooting, the defendant rose as usual, readied himself for school, and ate breakfast. As the three boys walked to the bus, the defendant insisted that the Fulks brothers board the bus ahead of him.[1] As the brothers walked to the back of the bus, the defendant aimed a .45 caliber semi-automatic handgun and fired six jacketed hollow point bullets at the victim. Three shots struck the victim in the torso. The first shot entered the upper right side of the victim's back and exited through the upper left side of the back. The second shot struck the victim in the right side of her chest and traveled through her right lung, trachea, and left lung before coming to rest in the upper left side of her back. The third shot also struck the victim in the right side of her chest and then traveled through her right lung, spinal column, and aorta before becoming lodged in the periaortic tissue.

After being shot, the victim attempted to radio for help but succumbed to her injuries before she was able to do so. Meanwhile, the defendant ran around the back of his house and into the woods as Joseph Fulks went inside to telephone 9-1-1. After the victim's foot slipped from the brake, Bobby Fulks steered the bus toward a telephone pole to keep it from going over a steep hill. Bobby Fulks and other high school students helped the remainder of the children out of the emergency exit and into a nearby residence.

By the time the first police officer arrived on the scene, the victim had died. After the officer confirmed that the victim was dead, he saw the defendant's father, Charlie Clinard, walking toward the bus. Mr. Clinard told the officer that the defendant had shot the victim and retreated to the woods behind the family residence. Officers later reached the defendant on his cellular telephone, and he agreed to surrender. Shortly thereafter, the defendant emerged from the woods carrying the .45 caliber handgun in one hand and the magazine in the other. He laid both on the ground and surrendered to the authorities.

At the conclusion of the trial, the jury convicted the defendant of the single, charged offense of first degree premeditated murder. Because the State had not sought a sentence of life imprisonment without the possibility of parole, the defendant received the statutorily mandated sentence of life imprisonment. *See* T.C.A. §§ 39-13-202(a)(1); -204 (2006).

*I. Photographs*

The defendant firsts asserts that the trial court erred by admitting photographs depicting the victim inside the school bus after she had died because "medical testimony could and did adequately describe the condition of the victim." The State contends that the photographs were relevant and neither graphic nor gruesome and were, as a result, admissible. We agree with the State.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court

---

[1] Joseph and Bobby Fulks's mother, Lisa, is the defendant's step-sister. Lisa Fulks, her husband, and her sons had recently moved into the home the defendant shared with his parents.

must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id*. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

In this case, the State introduced several post-mortem photographs of the victim taken while she remained inside the school bus. None of the pictures contains any depiction of the injuries suffered by the victim. Instead, each of the photographs shows only the victim slumped over in her seat, her seatbelt still fastened. Because the photographs do not actually depict any of the victim's injuries, the medical testimony and the information conveyed within the photographs does not overlap. Further, the purpose of the photographs was not to depict her injuries but instead to convey the relatively helpless position of the victim at the time of her death. Finally, because none of the photographs can be characterized as graphic, gruesome, or cumulative, the trial court did not err by admitting them into evidence.

## II. Psychiatric Evaluation

The defendant next contends that the trial court erred by permitting the State to pursue a psychiatric evaluation of the defendant after the defendant had undergone such an examination pursuant to the commitment order of the juvenile court. The State asserts that the evaluation conducted pursuant to the juvenile court commitment order has no bearing on the State's right to an independent psychiatric evaluation of the defendant pursuant to Rule 12.2 of the Tennessee Rules of Criminal Procedure. We agree.

A short procedural history regarding the various evaluations of the defendant is in order. Shortly after the defendant's arrest on March 2, 2005, the juvenile court ordered, based upon an agreement between the prosecution and defense counsel, that the defendant be "placed in a hospital or treatment resource . . . for the purposes of evaluation and for treatment necessary to the evaluation for not more than 30 days . . . pursuant to T.C.A. 37-1-128." Code section 37-1-128 provides,

> If, during the pendency of any proceeding under this chapter, . . . . the court determines that there is reason to believe that the child:
>
> (A) Is mentally ill; and

-3-

> (B) Poses an immediate substantial likelihood of serious harm, as defined in title 33, chapter 6, part 5, because of the mental illness;
>
> the court may order the child placed in a hospital or treatment resource, as defined in § 33-1-101, for the purposes of evaluation and for treatment necessary to the evaluation, for not more than thirty (30) days. If a child is placed in a state-supported facility, the child shall be in the custody of the commissioner.

T.C.A. § 37-1-128(e)(1) (2006). After the completion of the evaluation, the State requested, and was granted, access to the records of the evaluation. Later, at the transfer hearing, the defendant primarily contested transfer from juvenile to circuit court on the basis of his diminished mental capacity. Eventually, however, the defendant agreed to the transfer.

Upon transfer of the case to the circuit court, the State, cognizant of the defendant's previous attempts to rely on a mental-health-based defense, sought an independent psychological examination of the defendant pursuant to Rule 12.2 of the Tennessee Rules of Criminal Procedure. That rule provides that "[o]n motion of the district attorney general, the court may order the defendant to submit to a mental examination by a psychiatrist or other expert designated in the court order." Tenn. R. Crim. P. 12.2(c)(1). The defendant objected to the evaluation on the basis that he had previously been examined pursuant to the commitment order and by his own forensic psychologist. After a hearing, the trial court granted the State's motion for independent psychological evaluation.

The defendant has failed to cite any authority for his argument that the State is not entitled to seek a psychological evaluation under Rule 12.2 when a previous evaluation has been conducted pursuant to a juvenile court commitment order. Also he has cited no authority for the proposition that evaluation by the defense's forensic psychologist precludes an independent mental examination on motion of the State. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b).

Perhaps more importantly, the defendant's allegation that "the State was shopping for an expert who agreed with the State" is not factually supported in the record. The record is clear that the evaluation conducted prior to the defendant's transfer from juvenile court occurred based upon the order of that court, not at the request of the State. Indeed, it was the defendant who suggested that his compromised mental health contributed to his commission of the crime, leading the juvenile court to order the evaluation. Once the case was transferred to the circuit court, the prosecution made only a single request for an independent evaluation. The defendant has failed to establish that the State was not entitled to this evaluation. Moreover, he has failed to establish how he was prejudiced by the State's being granted the evaluation other than to allege that "allowing an additional mental examination allowed the State to put on evidence countervailing the essence of the

-4-

defense case." The presentation of countervailing proof by the parties is the sum and substance of our adversary system of justice and does not represent a basis for relief in this case.

### III. Disqualification of District Attorney General's Office

The defendant argues that the trial court should have granted his motion to disqualify the entire district attorney general's office on the basis of a conflict of interest. Specifically, he alleges that "a person involved in defense strategy and planning sessions, to include knowledge of work product, obtained employment with the office of the District Attorney General." He contends that a new trial is warranted because "the State seemingly had advanced knowledge of appellant's strategy." The State asserts that the defendant is not entitled to relief because although a former assistant district public defender obtained a position as an assistant district attorney general during the pendency of the defendant's case, that individual did not participate in the defendant's case and, in any event, was screened from participating in the defendant's case upon joining the district attorney general's office. Because the defendant has failed to present any evidence of a conflict of interest requiring disqualification beyond that of the individual prosecutor, he is not entitled to relief.

It is clear, in this case, that the disqualification of assistant district attorney general Steve Powers was appropriate given the fact that he was employed as an assistant public defender at a time when the defendant was represented by that office. *See State v. Davis*, 141 S.W.3d 600, 613 (Tenn. 2004) (citing *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000), and stating that even where there is "no actual conflict of interest, disqualification could also be based on the appearance of impropriety"). The question whether a conflict existed that necessitated disqualification of the entire district attorney general's office, however, requires greater scrutiny.

In *Davis*, our supreme court, construing the disciplinary rules as they existed prior to the adoption of the Rules of Conduct, observed that where "disqualification of a prosecutor is required, the trial court must determine whether to also disqualify the entire District Attorney General's office." *Id.* (citing *Culbreath*, 30 S.W.3d at 313). This determination, the court held, "requires an inquiry into whether the prosecutor who has the conflict of interest has participated in the ongoing prosecution, including the disclosure of any confidences, and whether the prosecution has established that the prosecutor has been screened from the prosecution." *Id.* The party "questioning the propriety of the representation" has the burden of proof. *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003). On appeal, the trial court's decision will not be reversed absence an abuse of discretion. *Id.*

In this case, evidence adduced at the hearing on the defendant's motion to disqualify established that Steve Powers worked as an assistant public defender at the time the public defender's office was appointed to represent the defendant. Shortly thereafter, Mr. Powers obtained employment as an assistant district attorney general, and the defendant obtained private counsel. Mr. Powers testified that while employed as an assistant public defender he handled cases in the Humphreys County Circuit Court and had very little contact with the defendant's case. According to Mr. Powers, the only contact he had with the defendant's case occurred when he overheard

another assistant public defender and an intern with whom he shared office space briefly discuss the case. He could not recall any details of the conversation and stated that he had no knowledge about the case. He testified that since being employed as an assistant district attorney, he has handled "DUI cases in Dickson and Humphreys Count[ies]." Mr. Powers stated that he has had no contact at all with the prosecution of the defendant and did not even know which of the other assistant district attorneys had been assigned to prosecute the case. He testified that he had also received a letter from the district attorney general instructing him to screen himself from the case. The State also introduced into evidence a letter from the district attorney general to the defendant, informing him of Mr. Powers' employment and explaining the screening procedure.

At the conclusion of the hearing, the trial court accredited Mr. Powers' testimony that he was not personally involved in the defendant's case during the time he worked as an assistant public defender. The court also found that the district attorney's office had implemented adequate screening procedures to ensure that Mr. Powers would have no contact with the prosecution of the defendant's case. The trial court specifically accredited Mr. Powers' testimony that he did not have access to the defendant's case file.

In his appeal, the defendant does not assert that Mr. Powers inappropriately "switched teams" during the pendency of the defendant's case, but instead he argues that the disqualification of the district attorney general's office is necessary to avoid the "appearance of impropriety." We disagree. The Supreme Court's Rules of Professional Conduct, which govern in this instance, provide that a law firm may avoid the disqualification on the basis of a conflict of interest of the individual attorney from being imputed to the firm as a whole by: (1) assuring that the disqualified attorney "is prohibited from participating in the representation of the current client," (2) concluding that no other attorney within the firm has acquired any material and confidential information from the disqualified attorney, (3) implementing "screening procedures to effectively prevent the flow of information about the matter between the personally disqualified lawyer and the other lawyers in the firm," and (4) "advis[ing] the former client in writing of the circumstances that warranted the implementation of the screening procedures required by this Rule and of the actions that have been taken to comply with this Rule." Tenn. Sup. Ct. R. 8, Rule 1.10(c)(1-4). The Rule also states, however, that imputed disqualification cannot be avoided when:

> (1) The disqualified lawyer was substantially involved in the representation of a former client; and
>
> (2) The lawyer's representation of the former client was in connection with an adjudicative proceeding that is directly adverse to the interests of a current client of the firm; and
>
> (3) The proceeding between the firm's current client and the lawyer's former client is still pending at the time the lawyer changes firms.

*Id.* at (d).

Here, the State clearly complied with the mandates of subsection (c) regarding the screening of the disqualified attorney. Moreover, the defendant has failed to establish that this is a situation where imputed disqualification cannot be avoided by the implementation of screening procedures. The trial court accredited Mr. Powers' testimony that his contact with the defendant's case while he was employed by the public defender's office was *de minimus* and that he had had absolutely no contact with the case since joining the attorney general's office. Although the defendant claims that "[t]he District Attorney General's office is small enough that almost daily contact between attorneys will occur" and that "computer files will almost certainly prove to be open to all members of the General's staff," he has failed to support either claim with evidence in the record. Under these circumstances, the trial court did not abuse its discretion by refusing to disqualify the office of the district attorney general.

## IV. Sentencing

As his last complaint, the defendant asserts that the trial court erred by applying the statutory sentencing scheme for first degree murder in this case because that scheme is unconstitutional as applied to the defendant. Specifically, he contends that the defendant's sentence of life imprisonment violates the federal constitutional ban on cruel and unusual punishment due to the defendant's youth. The State submits that because the defendant's sentence is not "grossly disproportionate to his crime," the Eighth Amendment ban on cruel and unusual punishment is not applicable.

Both the Eighth Amendment to the United States Constitution and Article 1, section 16 of the Tennessee Constitution prohibit the infliction of cruel and unusual punishment. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); Tenn. Const. art. 1, § 16 ("That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). Despite the nearly identical wording of the two provisions, our supreme court has consistently afforded a more expansive interpretation to Article 1, § 16 than that afforded to the Eighth Amendment. *See State v. Harris*, 844 S.W.2d 601, 602 (Tenn. 1992). Accordingly, although the United States Supreme Court has held that the Eighth Amendment contains no proportionality guarantee outside of sentencing for a capital offense, *see Rummel v. Estelle*, 445 U.S. 263, 274, 100 S. Ct. 1133, 1139 (1980) (recognizing that "for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative"); *Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S. Ct. 2680, 2701 (1991) (refusing to extend proportionality review to non-capital offenses), our supreme court has concluded that the state constitution provides for the proportionality review of non-capital sentences. *Harris*, 844 S.W.2d at 602. Thus, despite the fact that the defendant couches his claim in terms of the Eighth Amendment, that provision does not avail him the proportionality review he desires because his is not a capital case. Thus, he could be afforded relief, if at all, only under Article 1, § 16.

In adopting proportionality review for non-capital offenses, our supreme court also adopted the proportionality test fashioned by Justice Kennedy in his *Harmelin* concurrence, that is,

> [T]he sentence imposed is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends - the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*Harris*, 844 S.W.2d at 602. The contours of this test were first established by the Supreme Court in *Solem v. Helm*, 463 U.S. 277, 291-92, 103 S. Ct. 3001, 3010 (1983), *overruled by Harmelin*, 501 U.S. at 965, 111 S. Ct. at 2686 (holding that "*Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee), and later espoused by Justice White in his *Harmelin* dissent, *see Harmlein*, 501 U.S. at 1018, 111 S. Ct. at 2714 (White, J., dissenting).

Even this test, however, does not avail the petitioner the type of review he desires. He asks this court to review the sentence imposed in light of his age and circumstances, and, on the basis of those factors, conclude that the life sentence is disproportionate. Such a review, however, is not permitted by either federal or state jurisprudence. Examining the defendant's sentence under the criteria established in *Harris*, we conclude that a sentence of life imprisonment is not "grossly disproportionate" to the crime of first degree premeditated murder. Because we have concluded that the sentence is not grossly disproportionate to the crime, we need not consider the other *Harris* factors. In consequence, the defendant is not entitled to relief on this issue.

## CONCLUSION

The trial court did not err by admitting into evidence post-mortem photographs of the victim, by allowing the State an independent psychological examination of the defendant, by refusing to disqualify the district attorney general's office, or by imposing a sentence of life imprisonment. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-8-