IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson February 14, 2012

## RICHARD FRANK D'ANTONIO v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1280    J. Randall Wyatt, Jr., Judge**

_____

**No. M2011-01378-CCA-R3-PC - Filed June 27, 2012**

_____

The Petitioner, Richard Frank D'Antonio, appeals the denial of post-conviction relief from his first degree murder conviction and resulting life sentence. He contends that the trial court erred in determining that he received effective assistance of trial counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

David M. Hopkins, Nashville, Tennessee, for the Petitioner-Appellant, Richard Frank D'Antonio.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Thomas B. Thurman and Kathy Maronte, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner was convicted by a Davidson County jury of first degree premeditated murder and assault with intent to commit murder. State v. Richard Frank D'Antonio, No. M2003-03052-CCA-R3-CD, 2005 WL 2874657, at *1 (Tenn. Crim. App., at Nashville, Oct. 26, 2005), perm. app. denied (Tenn. May 1, 2006). The Petitioner received a life sentence for the first degree premeditated murder conviction; however, the conviction for assault with intent to commit murder was subsequently dismissed based on the statute of limitations. Id. The Petitioner's conviction and sentence were affirmed by this court. Id. On direct appeal, this court summarized the proof presented at the Petitioner's trial:

At the time of his death, the victim was Chart Director for Cashbox magazine. The victim was hired for this position by the defendant in 1987. The defendant, in 1987, was the Division Manager at Cashbox but was not employed there at the time of the victim's death.

Sharon Pennington, a record promoter for Step One Records in March of 1989, testified that she and the victim were good friends. She stated that they had attended a movie on March 9, 1989, and that she dropped the victim off at his office in the early evening. She said the victim was uncharacteristically "nervous" and "fidgety" that day.

Ms. Pennington said that the Cashbox chart for independent artists was not legitimate and that the victim had been taking steps to make it legitimate and improve its image. She said that Chuck Dixon's control over the independent artists chart at Cashbox was so widely known that the magazine was often derisively called "Chuckbox" by members of the music industry. Ms. Pennington knew Chuck Dixon from her company having hired him as an independent record promoter. She knew the defendant due to his work at Cashbox and he was often with Dixon at meetings with her employers. She recalled that the defendant had a back injury at that time.

On the day of the victim's death, Ms. Pennington had received two angry phone calls from Dixon asking her to relay messages to the victim. Dixon wanted the victim to restore some stations that had been dropped from those used to compile the charts. She explained that starter or smaller radio stations have a larger play list, making it easier for a promoter to obtain play for particular songs. The victim had dropped several smaller stations in favor of stations with larger listening markets. This caused problems for Dixon in manipulating the selection of songs to be played. After she told the victim about Dixon's calls and that Dixon was upset, the victim responded that he expected Dixon to be upset.

Sammy Sadler was, in March 1989, promoting and recording for Evergreen Records. His promoter was Chuck Dixon. Sadler and the victim were "acquaintances and becoming friends." Sadler met the victim at the Cashbox office on March 9, 1989, and the two went out to eat and then went to Sadler's office at Evergreen Records. The two men left and went to the victim's car which was parked on Sixteenth Avenue South. As Sadler was entering on the passenger side, a man, wearing gloves and a mask and

-2-

displaying a gun, appeared at Sadler's door. Sadler threw up his arms to protect his head and was shot once. Sadler did not recall making his way to a nearby apartment for assistance. Sergeant Kenny Dyer questioned Sadler that night, and Sadler reported that the assailant was wearing all black clothing and a ski mask. Sadler also thought the assailant was a black male of slender build.

On the night of the murder, two Belmont students witnessed the incident. Robert Lyons, III, was driving down 16th Avenue South; his passenger was Allison Kidd (now Chimento). Lyons witnessed the victim roll out of his car and start running. A man came from the other side of the victim's car and started pursuing the victim, shooting two or three times. The victim fell, and the assailant ran to him and shot the victim three more times. Lyons stated that the shooter had on a black ski mask, black clothing, and held in his right hand a blue-steel revolver. He estimated that the shooter was 5'10" to 6' tall and had a stocky build. Lyons stated that the eye holes in the shooter's mask were large enough for him to see that the shooter was Caucasian. He described the shooter as running with an unusual side-to-side gait. The police responded to a call of a shooting within three minutes.

Allison Kidd Chimento recalled driving down Music Row on March 9th with Bob Lyons a little after 10:00 p.m. when two men ran in front of their car. One man was fleeing from a man dressed in black and a ski mask, carrying a black gun in his right hand. She saw the shooter stand over the fallen victim and fire repeated shots. Mrs. Chimento said the assailant was from 5'9" to 6' tall and overweight in the mid-section. The shooter fled between buildings to the east.

On March 9, 1989, Phillip Barnhart lived in an apartment on Sixteenth Avenue South. He heard shots and looked out his window where he saw two men running down the street in a "zigzagged" fashion until they ran out of his vision. Barnhart thought one man was wearing a ski mask. Sammy Sadler was able to come to Barnhart's apartment, where he collapsed.

Donnie Lowery was in his apartment on Sixteenth Avenue South on the night of the victim's murder. He heard gunshots and looked out his window. He witnessed a man chasing and shooting at another man. When the victim fell, the shooter went to the body and shot another two or three times. The man was shooting with his right hand and, when he ran off, it was with an "abnormal gait," "somewhat like a limp." He said the shooter was 5'10" to 6' tall and had a "stocky build."

-3-

Kathy Hunter was visiting Lowery at the time of the shooting. She saw a man running and yelling, being pursued by a man dressed in black. When the victim fell, his pursuer walked up and shot him two or three more times. She stated the assailant was wearing a ball cap, as well as a ski mask. She estimated the assailant's height as 5'10" to 6' and said he was "stocky built."

Officer Charles Anglin, an employee in the Identification Division of Metro Nashville Police Department, was one of the officers who gathered evidence at the scene. Among the items found were a spent projectile found near the victim's head and a ball cap near the victim's right foot. A hair found in the ball cap was submitted to the FBI for analysis. Agent Douglas Deedrick, a hair and fiber expert, testified that the black hair had characteristics of cat hair.

Detective Pat Postiglione interviewed the defendant on March 28, 1989. He described the defendant as cooperative but nervous. The defendant appeared to be in discomfort and complained of back problems. Detective Postiglione observed that the defendant was heavier in March of 1989 than at the trial.

Detective Bill Pridemore was the lead investigator of the victim's murder in 1989. He stated that two projectiles were removed from the victim's body during the autopsy. Those, together with the projectile found at the scene, were submitted for testing, as was a baseball cap found at the scene.

In February of 1993, Detective Pridemore learned that an individual named Steve Daniel had sold the defendant a handgun in 1989. Detective Pridemore interviewed Mr. Daniel and was provided with four spent bullets and one live round of ammunition which Daniel said was similar to that supplied the defendant when the defendant bought the gun. It was Detective Pridemore's understanding that the ammunition was obtained by Daniel after the defendant had purchased the gun.

By April of 2002, Detective Pridemore had been assigned to the cold case files within the Metro Nashville Police Department and was again working on this case. He contacted Steve Daniel and learned that the gun sold to the defendant had been test fired at Daniel's home on March 9, 1989, the day of the defendant's purchase. Detective Pridemore went to the scene of the test firing in Flintstone, Georgia and there recovered thirteen projectiles that were embedded in the ground. These were submitted to the TBI for testing.

In July of 2002, Detective Pridemore went to Las Vegas, Nevada, to escort the defendant back to Nashville after his arrest. The defendant made a statement when he was informed of the murder charge, that it must be about Kevin. At a later date, after the defendant's transfer back to Nashville, the defendant told Detective Pridemore that he would talk to him about the case if Pridemore could arrange for him to be housed in a private cell.

Detective Pridemore stated that he had measured the defendant in stocking feet and that he was 5'11" tall. He also testified that Chuck Dixon had died in 2001.

TBI Special Agent Tommy Heflin testified as an expert in firearms and ammunition analysis. He stated that the two projectiles removed from the victim's body and the third projectile found at the crime scene were all fired from the same weapon. He identified them as .38 caliber, .357 size wad-cutter lead projectiles, and most probably were reloads. Agent Heflin also examined the thirteen projectiles found at Flintstone, Georgia. Of those, he concluded that one was fired from the same gun barrel that was used to shoot Kevin Hughes. That projectile was also a lead wad-cutter.

Dr. Mona Gretzel Case Harlan-Stevens, a forensic pathologist, performed the autopsy of the victim. She testified that four separate bullets struck the victim's body, and two were recovered. The cause of death was a gunshot wound to the head, and the manner of death was homicide.

Steven Daniel, a convicted marijuana dealer, began cooperating with Georgia and federal officers and became known to the Nashville police. He testified that he had known the defendant since 1985 or 1986 and that they visited in each other's homes. The defendant was at Daniel's home in Flintstone, Georgia on March 9, 1989. Daniel said the defendant arrived unannounced in mid-afternoon and wanted to buy a pistol. Daniel sold the defendant a thirty-eight (.38) pistol and provided reloaded thirty-eight (.38) caliber bullets with the gun. The two men test fired the gun behind Daniel's house. The defendant left Daniel's house between 6:15 and 7:00 p.m. (CST).

Daniel stated that he remembered the date due to the defendant bringing it up in conversation several times later, as well as the defendant's then wife, Carolyn, having made inquiries about that evening. The defendant told Daniel to tell Carolyn that he had not left Daniel's home until after the 11:00 p.m.

(EST) news that night. According to Daniel, the drive from his home in Flintstone to Nashville takes about two hours and fifteen minutes.

In 1993, Daniel reported to Georgia authorities that he might have information about a murder case. Daniel had seen a television program on Crime Stoppers concerning Kevin Hughes' murder. The program made reference to the assailant's strange running gait. Daniel had witnessed the defendant run and described it as "a real strange gait . . . more like an animal would run than a person."

At the request of the police, Daniel recorded phone conversations with the defendant. In one conversation, the defendant ma[de] reference to renewed police interest in "when that boy got killed up here . . . out on Music Row" and request[ed] Daniel to say, if asked, that the defendant left Daniel's house after the 11:15(EST) news that night. Daniel stated that the defendant brought up this date three or four different times in their various conversations. When Daniel asked about the gun he had sold the defendant, the defendant said, "[I]t's gone." Daniel stated that he cooperated with the Nashville detectives when contacted again in 2002 and that he showed them the area where he had test fired weapons at his former home in Flintstone.

Gene Kennedy testified that he had been promoting and producing records for twenty-eight years. He stated that he had, until about 1988, promoted to Cashbox magazine. Kennedy was approached by Chuck Dixon, who offered to promote to Cashbox for him in return for a fee of $1500 and a purchase of an ad in Cashbox by Kennedy. Kennedy refused and, for a period of two and one-half to three years, Kennedy's promoted records did not appear on the Cashbox charts. Kennedy believed that, in 1989, the Cashbox charts were controlled by Dixon and the defendant and that the charts lacked legitimacy. Kennedy had lunch with the victim a week before the victim's death and said the victim was acting "very nervous." On cross-examination, it was established that some records promoted by Kennedy in 1989 were charted in Cashbox. He claimed to have no knowledge of this as he had quit following the Cashbox charts.

Tom McEntee served as Division Manager of Cashbox from November of 1985 to April of 1987. He had hired the defendant to assist with the charts. When McEntee left Cashbox, the defendant took his place. McEntee said the defendant was friends with Chuck Dixon and had gone to work with Dixon when the defendant left Cashbox in 1988 or 1989. McEntee explained that

-6-

charts could be manipulated either by false reporting from radio stations controlled by an interested person, e.g., a promoter, pocket stations, or could simply be altered by the person compiling the charts.

Robert Metzger testified pursuant to a use immunity agreement with the district attorney. He had worked as a producer and promoter since 1971. He testified that, in the late 1980's, Cashbox's chart was the only exposure independent artists had in the Nashville music community. He said that the defendant was then in charge of Cashbox. In order to have a song charted, it was required that you hire Chuck Dixon and buy an ad in Cashbox. Initially, Metzger's clients paid the defendant this fee, although Metzger was aware Dixon received part of the money. The minimum amount of money for six or seven weeks on the chart was $2500. Metzger illustrated the illegitimacy of the system by recounting that after a payment by his client, there was a problem with manufacturing the record. Nevertheless, the record, "Gal from San Antone," appeared on the Cashbox chart before a single copy was available for play or sale.

Metzger had seen the victim at a radio seminar shortly before the murder. There he observed the victim and Chuck Dixon having a heated argument. Metzger was unable to hear the words exchanged but said that Dixon was trying to give the victim money and that the victim repeatedly refused to accept it. After this incident, Metzger had a meeting with the defendant and Chuck Dixon. One of Metzger's artists was about to release two more records and was preparing to pay $15,000 to have the records charted and to keep them charted for an extended time. Metzger expressed his concerns to Dixon in the following manner:

| Metzger: | I told him, I said, Chuck, you know, I saw you and Kevin having this big argument out at the Radio Seminar. And I said, you know, he's already dropped some of your pocket stations, which weakens your ability to keep a record in for a long time. And I know he's about to drop a bunch more of your pocket stations. And I said, Chuck, I'm not going to, you know, give you this fifteen thousand dollars unless I know for a fact you can handle Kevin Hughes. |

Assistant DA:　　　Did you also explain to him something that you had heard?

Metzger:　　　I did, General. I said, you know, the rumor is all over Music Row is that Kevin is going to go to the media and expose this chart fixing scheme you guys are working at Cashbox. And I said, you know, if he does that, you know, this is going to look very bad on me and my clients and everybody involved in this.

Dixon responded that he was aware of the rumor and said, "I will handle Kevin Hughes. And if I, you know, can't handle him, he'll be gone." The defendant was present during this conversation. Upon receiving those assurances, the $15,000 was paid, plus an advertisement taken in Cashbox magazine. In return, the artist's release was the highest charted independent record, and he was named Cashbox Male Vocalist of the Year. Metzger clarified that the defendant was not employed at Cashbox during the time of the foregoing conversation but that he had become partners with Chuck Dixon.

Steve Hess was hired at Cashbox by Chuck Dixon as an assistant chart director a few weeks before the victim's death. After the victim's death, Hess assumed the duties of chart director and was trained by the defendant. Hess did not know whether Dixon was employed by Cashbox, but the owner of the magazine, George Albert, had made it clear that Dixon was in charge. Dixon did not maintain an office at the Cashbox site but was frequently in the Cashbox office. Hess was not instructed to manipulate the charts and, to his knowledge, they were compiled legitimately during his tenure.

Gary Bradshaw worked as a music promoter in 1989. He had known the victim, and the victim had expressed his dissatisfaction with his job at Cashbox and an intent to leave his job. About three months after the victim's death, Bradshaw was contacted by Chuck Dixon and agreed to work with him. He learned that the Cashbox charts were illegitimate. A chart position could be acquired by hiring Chuck Dixon for $1500 to $2000 and by paying Cashbox for an advertisement costing $750. Bradshaw testified that Dixon had control over the reporting of over half the 125 stations that reported to Cashbox. Those controlled were known as pocket stations.

The defendant was working for Dixon when Bradshaw came to work at Cashbox, but Bradshaw was unaware of any duties performed by the defendant. Bradshaw stated that when Dixon would become angry with someone, he would comment that their fate could be the same as Kevin's. Bradshaw stated that he saw firearms in the Cashbox office and that Dixon carried a weapon. The first time Bradshaw met Dixon, two of Dixon's "henchmen" frisked Bradshaw.

Sharon Corbett worked in the same building which housed Cashbox in 1989 and was a good friend of the victim. She testified that the victim had become unhappy with his job and was thinking of resigning. She also knew the defendant and said that he favored his hip to the point it was noticeable when he walked.

Cecilia Bragg was hired as a receptionist at Cashbox in 1987. She knew the victim, Chuck Dixon, and the defendant. She said that Dixon came to Cashbox regularly. She noted that the defendant had a bad back and limped. Immediately before the victim's murder, she said the victim seemed to be concerned and upset.

Sandra Daens worked at Cashbox in May of 1987. She had overheard the defendant tell others that chart positions could be acquired for the price of an advertisement in the magazine. She said Chuck Dixon was a frequent visitor with the defendant at Cashbox. She was fired by the defendant in September of 1987.

Mara Langlois, an investigator with the Davidson County District Attorney's office, served a search warrant at the home of Chuck Dixon in January of 2001. Two payment books containing names and dollar amounts were seized. One book's entries began in 1987 and ended in 1988 (orange book). Another book's entries began in 1990 and ended in 2000 (red book). No records were recovered from the period from October 1988 through 1989. The total amount of the payments in 1988 was $138,757.09. There were five payments from the defendant in 1988, totaling $3499. No payments from the defendant were reflected after 1988. The 1990 payment total was $295,796.97, and the total for 1990 through 2000 was $2,188,787.05. Dixon's rolodex contained the defendant's Las Vegas telephone number.

Carolyn Cox had been married to the defendant from 1986 until July of 1989. She testified that the defendant earned $13,000 per year when employed

at Cashbox. After leaving, the defendant started an artist development business and worked with Chuck Dixon. After leaving Cashbox, the defendant acquired two houses, three cars, a grand piano, and a motorcycle.

Ms. Cox stated that on March 9, 1989, the defendant was not at home when she went to bed between eleven p.m. and twelve o'clock midnight. She was awakened by a phone call from Chuck Dixon at 3:00 a.m. She told Dixon that the defendant was not at home. After she had hung up the phone, the defendant appeared and asked who had called. The defendant told her he had been at Steve Daniel's house. Later, the defendant instructed her to tell police investigators that he was at home on the night of the victim's murder. Ms. Cox stated that during their marriage, the defendant suffered from a hiatal hernia and a bad back. She also said that they owned a black cat in 1989. She further testified that the defendant was right-handed.

Id. at *1-7.

On November 15, 2006, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition on November 17, 2008.

**Post-Conviction Hearing.** The Petitioner was represented at trial by the District Public Defender for Davidson County and an assistant public defender. The district public defender who defended the Petitioner at trial died prior to the April 19, 2011 post-conviction hearing, and only the Petitioner and the assistant public defender who represented the Petitioner at trial testified at this hearing. A copy of the trial transcript, this court's opinion on direct appeal, and documents related to the district public defender's representation of Milton Reyes in an unrelated 1988 case were entered as exhibits. These documents showed that the district public defender defended Reyes in 1988 against the charges of assault with intent to commit murder, malicious shooting, and aggravated assault. The victim in the 1988 case against Reyes was Carl Hanson, who had no connection to the facts in the Petitioner's case.

The Petitioner testified that the district public defender and the assistant public defender represented him at trial. The Petitioner said he specifically requested that the assistant public defender be appointed to his case, even though the district public defender had wanted another attorney in his office to be assigned to the case.

The Petitioner said he met with the district public defender one to two times and did not see him again for a few weeks. He then called the public defender's office and requested

-10-

to see him, and they met again. He stated that when he and the district public defender met they would "have screaming arguments over different issues of the case" and sometimes the district public defender would "get mad and leave." The Petitioner said that he met with the district public defender "maybe ten times" throughout the course of the representation and that these meetings typically lasted fifteen to twenty minutes. The Petitioner claimed that the district public defender told him that he was going to win the Petitioner's case. Although the Petitioner brought up the issue of pursuing alternative suspects several times during their meetings, the district public defender told him that "he didn't want to go chasing [sic] any rabbit holes." The Petitioner acknowledged that the district public defender provided him a copy of the discovery received from the State and admitted that he had been able to review this discovery prior to trial.

The Petitioner claimed that the district public defender "didn't really have a [defense] strategy" at trial. He also claimed that he smelled alcohol on district public defender's breath when they met to discuss his case. The Petitioner said he and the district public defender "just argued and screamed at each other for . . . lots of times. And finally, he would send [the assistant public defender] out to talk to me." The Petitioner acknowledged that he had a "pretty good relationship" with the assistant public defender. He claimed the assistant public defender believed that they should have pursued alternative suspects in the case and wanted him to testify at trial. The Petitioner said he preferred this defense strategy and wanted the assistant public defender to handle the case instead of the district public defender, who he claimed "didn't seem to want to do anything."

The Petitioner said that the district public defender was granted a seven-week continuance of his trial. During that period, the Petitioner remembered meeting with the assistant public defender but did not recall meeting with the district public defender. The Petitioner and the assistant public defender continued to talk about an alternative suspect defense theory, but the attorney informed the Petitioner that the case "was [the district public defender's] baby, that his hands were tied."

The Petitioner claimed that the district public defender provided ineffective assistance of counsel because he failed to locate and subpoena Milton Reyes, an alternative suspect, for trial. The Petitioner said he had requested that the district public defender hire a private investigator to investigate certain alternative suspects, especially Reyes. He claimed the police report indicated Reyes had confessed to several different people that he had shot two individuals on Music Row. He said the district public defender "just shrugged that [defense theory] off."

The Petitioner also said that the district public defender provided ineffective assistance of counsel in failing to locate George Woodall, Randy Smith, and Ricky

-11-

Denoblough for trial. The Petitioner claimed these men were important because they were the individuals "that Milton Reyes tried to buy a gun off of or bought a gun off of [sic] and told that he had shot two people on Music Row." The Petitioner said that the district public defender, in refusing to investigate or subpoena these individuals, claimed that "he would win this case and he didn't need to pursue them." He also said that the district public defender believed "the whole case was about [Chuck] Dixon and . . . he could win it on that ground."

In addition, the Petitioner claimed that the district public defender provided ineffective assistance of counsel in failing to withdraw from his case because of a conflict of interest stemming from the district public defender's representation of Reyes in an earlier, unrelated case. He said that neither of his attorneys informed him of the district public defender's earlier representation of Reyes. The Petitioner asserted that the district public defender said he was not going to pursue Reyes or the other witnesses because he could not find them and the court would not give him the money to hire a private investigator to locate them. He claimed that if he had known of the district public defender's prior representation of Reyes, he would have fired him.

The Petitioner further alleged that the district public defender provided ineffective assistance of counsel because he prevented the Petitioner from testifying at trial. The Petitioner claimed that the district public defender "strongly urged" him not to testify at trial and "more or less strong[-]armed [him] to waive [this right]." However, the Petitioner claimed that he and the assistant public defender believed that he should testify. He asserted that his testimony would have "rebutted" Karen Cox's testimony that he was not at home the night of the victim's murder and would have shown that they were having marital problems at the time the offense occurred. The Petitioner also asserted that his testimony would have impeached Sandra Daens's testimony because he could have shown her as a "disgruntled employee" that he fired two years before the murder. He also said he would have testified about Steve Daniel's limp, the fact that Daniel owned a white vehicle similar to the vehicle seen near the scene of the crime, and the fact that Daniel sold guns in Nashville and had sold guns to Chuck Dixon, even though Daniel claimed that he was not friends with Dixon. Finally, the Petitioner stated he would have testified about his lack of motive and his innocence.

On cross-examination, the Petitioner acknowledged that he tried to have the assistant public defender who represented him at trial appointed to represent him in his post-conviction case. He further acknowledged that he never informed the trial court that he was dissatisfied with either attorney assigned to his case or that he believed the district public defender was an alcoholic. The Petitioner also admitted that the district public defender pursued the defense theory at trial that Steve Daniel had killed the victim because Daniel had

-12-

the murder weapon in his possession and because Daniel admitted that he had a limp from foot surgery. He also admitted that he signed a waiver stating that he understood his right to testify and that he was voluntarily waiving this right. Moreover, he acknowledged that he informed the trial court at trial that he was voluntarily waiving his right to testify in his own behalf. Finally, the Petitioner acknowledged that none of the witnesses that the district public defender allegedly failed to investigate were present to testify at the post-conviction hearing.

The assistant public defender who also represented the Petitioner at trial testified that he began working in the public defender's office in 2001 or 2002 and was assigned to the Petitioner's case after the Petitioner's specifically requested him. The assistant public defender said he did not recall meeting the Petitioner prior to trial; however, he remembered several meetings during trial. He also said that, at the time of trial, he believed the proper defense strategy was to pursue all of the alternate defense theories but that the district public defender did not agree with him regarding this strategy. He also stated that the district public defender, early in the representation, decided to pursue the theory that Steve Daniel was the "most likely alternative suspect" because he had possession of the murder weapon. The assistant public defender said he and the district public defender drove to Chattanooga to find Daniel, but Daniel was not home and refused to return their phone calls. However, he said the district public defender was able to get Daniel to admit at trial that he walked with a limp and that he had a relationship with Chuck Dixon.

The assistant district attorney said that although he had only been working in the criminal court a couple of months at the time, the district public defender had tried hundreds of jury trials at the time of the Petitioner's trial, so there "wasn't much of a conflict" between him and the district public defender, given that the district public defender was his "boss and he told [him] what to do." The assistant public defender recalled a conversation he had with the district public defender about pursuing alternate defense theories, wherein the district public defender "pulled rank" on him and told him that "this was his case" and they were going to try it his way. The assistant public defender also recalled a discussion that he and the district public defender had with the Petitioner's attorney in Las Vegas regarding the viability of pursuing all of the alternate defense theories and that the attorney in Las Vegas agreed with the district public defender that the case should be tried using a reasonable doubt defense.

The assistant public defender also recalled having a very brief conversation with the district public defender regarding the fact that the district public defender had represented Milton Reyes several years before in an unrelated case. At the time, the assistant public defender asked his boss if he believed he had a conflict because of the prior representation, and his boss responded in the negative. The assistant public defender said, "I don't

remember if [my boss] said, harumph or no or we're not going to do that. But my thought was – my belief from my boss [was] we're not talking about that anymore. That's not something I care to discuss or that's not something that I take seriously." He added, "I felt like [my boss] was in a much better position than I was [to make that call,] and . . . I didn't think it was my place to second guess my boss'[s] decision that he did not have a conflict." He also said, "I don't recall thinking, boy, this is something that's really worrying me, should I call the Board. I really thought, I believe [the district public defender] thought it was not a conflict." He said that the district public defender "decided not to raise the issue, that it wasn't important."

The assistant public defender said he remembered Reyes's name being in the file because Reyes had confessed to two individuals that he had shot somebody. However, he said that the district public defender did not think much of Reyes's confession because Reyes either "had an alibi or [had] pa[s]sed the polygraph, one of those two things." He said, "There was some reason that [the district public defender] didn't believe he was a viable suspect." He also stated he did not believe that his boss ever investigated Reyes or the witnesses to which Reyes made his confession. The assistant public defender said he never informed the Petitioner of his boss's prior representation of Reyes and was not aware if his boss ever informed the Petitioner of this fact. The assistant public defender described his boss's reasoning regarding conflict of interest issues:

> What I recall from [the district public defender] in general is that he believed that [p]ublic [d]efenders used the conflict of interest rules to get out of trying hard cases. And he believed that they did it too much. And so my thought at the time, the reason I didn't push it further, is I thought he was engaging in that analysis. I thought that he thought unless someone shows me a real life conflict, then I'm not going to get off [the Petitioner's case]. It's not something he would have brought up to the Court unless he believed it was an actual conflict, I believe.

The assistant public defender was aware that the Petitioner and the district public defender argued often during the case. He believed that the Petitioner wanted his boss to do a lot of work on the case that his boss felt was unnecessary. He also said that there was never any discussion about having private counsel defend the Petitioner because of the personality conflict between the district public defender and the Petitioner.

The assistant public defender said his boss had tried over three hundred cases, including a number of capital cases, and "had a very good reputation as a trial lawyer." The assistant public defender said that the district public defender's "ethics were beyond

-14-

reproach." Regarding the Petitioner's allegations that the district public defender was an alcoholic, the assistant public defender stated:

At the time of this trial, [the district public defender] and I were not close friends. We became very close friends, especially after I left the [public defender's] office[,] and he wasn't my boss. I never knew him to drink. He would have an occasional – he was one of those people who had a glass of wine on holidays. A[nd] if he won a trial, he might pour a Scotch. He wasn't a drinker.

He also said he never saw the district public defender meet a client or go to court while under the influence of alcohol. He explained, "[The district public defender] came to work at 6:00 a.m., usually six days a week. He . . . was a workaholic. He was not an alcoholic. . . . I'm not saying he never touched alcohol. It just wasn't his habit."

The assistant public defender said that the Petitioner never told him that the district public defender was forcing him not to testify. He said, "My recollection is we came to sort of a mutual agreement that given where the case was and what we had gotten from Mr. Daniel it was time to shut it down."

On June 9, 2011, the post-conviction court filed its order denying relief. Following entry of this order, the Petitioner filed a timely notice of appeal.

## ANALYSIS

**Standard of Review.** Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2010). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for

-15-

post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

**Ineffective Assistance of Counsel.** The Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to investigate Milton Reyes as an alternative suspect, failing to inform him that he had previously represented Reyes, which he alleges was a conflict of interest, and in failing to call him to testify in his own behalf at trial. The State responds that the Petitioner failed to present Reyes or any other related witnesses at the post-conviction hearing and that trial counsel's representation of Reyes in an unrelated case fifteen years before the Petitioner's case was not a conflict of interest. In addition, the State asserts that the Petitioner voluntarily signed a waiver of his right to testify. We agree with the State.

Vaughn repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S.

at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89.

First, the Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to investigate Milton Reyes as an alternative suspect. The Petitioner asserts that Reyes confessed to shooting two individuals on Music Row, which was "the crime for which [the Petitioner] was tried." However, as noted by the post-conviction court, the Petitioner failed to present Reyes or any other relevant witnesses at the hearing on his petition and "failed to produce sufficient evidence to establish the existence of [Reyes's] statement." This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Accordingly, we conclude the record supports the post-conviction court's determination that the Petitioner failed to carry his burden of establishing the deficiency and prejudice prongs required to prevail on an ineffective assistance of counsel claim.

Second, the Petitioner argues that trial counsel provided ineffective assistance of counsel in failing to inform the Petitioner that he had previously represented Reyes in a prior case, which he alleges was a conflict of interest. In response, the State argues that the record

supports the post-conviction court's determination that trial counsel investigated Reyes as an alternative suspect but rejected this defense theory after discovering that Reyes either passed a polygraph test or possessed a valid alibi for the time of the offenses. The State also argues that trial counsel was not required to withdraw or tell the Petitioner of his representation of Reyes in the unrelated 1988 case because trial counsel's representation of Reyes did not constitute an actual conflict of interest. Moreover, the State argues that the Petitioner failed to establish that trial counsel obtained any evidence relevant to the Petitioner's case during his representation of Reyes in 1988 and that the Rules of Professional Conduct do not prohibit trial counsel's later representation of the Petitioner. Finally, the State asserts the Petitioner failed to establish that trial counsel's performance was adversely affected by his earlier representation of Reyes in the unrelated 1988 case. We agree with the State that the Petitioner is not entitled to relief on this issue.

Tennessee Supreme Court Rule 8 states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Tenn. Sup.Ct. R. 8, RPC 1.7(a)(2) (emphasis added). In addition, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Tenn. Sup.Ct. R. 8, RPC 1.9(a) (emphasis added).

"[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" State v. White, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting State v. Culbreath, 30 S.W.3d 309, 312-13 (Tenn. 2000) (quoting Tenn. R. Sup. Ct. 8, EC 5-1)). "[I]f an attorney actively represents conflicting interests, prejudice is presumed." Netters v. State, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997) (citing Strickland, 466 U.S. at 692; Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980); State v. Thompson, 768 S.W.2d 239, 245 (Tenn. 1989)). However, unless the Petitioner proves that trial counsel was burdened by an actual conflict of interest, he must establish that trial counsel's performance was deficient and that he was prejudiced by this deficiency. Strickland, 466 U.S. at 692.

We conclude that the Petitioner failed to establish that the district public defender was burdened by an actual conflict of interest. Consequently, the Petitioner was required to prove that the district public defender's performance was deficient and that this deficiency prejudiced his defense. Here, the post-conviction court found that the district public defender's representation of Reyes in an unrelated case fifteen years prior to the Petitioner's

trial "did not impair or otherwise affect his independent professional judgment[,]" especially given the district public defender's strategic decision to focus on Steve Daniel as the most likely alternative suspect. The court accredited the assistant public defender's testimony that Reyes either had an alibi or passed a polygraph test regarding the offense in this case and that the district public defender's "ethics were beyond reproach." Finally, the post-conviction court determined that the Petitioner failed to carry his burden of establishing the deficiency and prejudice prongs required to prevail on an ineffective assistance of counsel claim. We conclude that the record supports the findings and conclusions of the post-conviction court.

Lastly, the Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to call the Petitioner to testify in his own behalf at trial. He claims that his testimony "would have countered [the testimony of the] State's witnesses that he was not home during the time the victims in this case were shot." He also claims that his testimony "would have . . . provided [evidence] that Steve Daniel drove a car similar to the one observed at the scene of the crime[] and that Mr. Daniel walked with a limp, as did the alleged shooter in this case." Finally, he asserts that his testimony would have shown "that Mr. Daniel and the victims had personal problems, establishing a motive for Mr. Daniel to have committed these crimes." The Petitioner argues that he was prevented from presenting a complete defense because trial counsel did not allow him to testify.

In response, the State argues that the Petitioner's "contradictory testimony about the voluntary nature of his decision not to testify effectively negates his claim[] that he wanted to testify and that [the district public defender] coerced him not to testify." It further argues that the record supports the post-conviction court's finding that there was no evidence to support the Petitioner's claim of coercion. We conclude that the Petitioner is not entitled to relief on this issue.

In denying relief, the post-conviction court determined that "there was no credible evidence presented at trial to support the Petitioner's allegation that [the district public defender] coerced the Petitioner into not testifying at trial." The court also found that the Petitioner signed a waiver of his right to testify at the conclusion of the State's case and was thoroughly questioned by the trial court regarding whether the waiver was knowingly and voluntarily given. In addition, the court determined that it was unlikely that the Petitioner was "strong[-]armed" by the district public defender, given the Petitioner's testimony at the post-conviction hearing that he and the district public defender often had differences of opinion during and before trial. Finally, the post-conviction court determined that the Petitioner failed to carry his burden of establishing the deficiency and prejudice prongs required to prevail on an ineffective assistance of counsel claim. The record clearly supports the ruling of the post-conviction court. Accordingly, we affirm the post-conviction court's denial of relief.

**Conclusion.** We conclude that the Petitioner has failed to meet his burden of establishing that he received ineffective assistance of counsel. Accordingly, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE