IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2019 Session

## DONALD PEDEN v. STATE OF TENNESSEE

**Appeal from Criminal Court for Davidson County**
**No. 2013-A-134     Mark J. Fishburn, Judge**

_____

### No. M2018-01670-CCA-R3-PC

_____

The petitioner, Donald Peden, appeals the denial of his petition for post-conviction relief, which petition challenged his convictions of attempted first degree murder and theft of property valued at $500 or less, alleging that he was deprived of the effective assistance of counsel. Because the petitioner's post-conviction counsel also represented the petitioner on direct appeal, we remand to the post-conviction court to determine whether the petitioner knowingly and voluntarily agrees to waive post-conviction counsel's conflict of interest.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Vacated and Remanded

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Manuel B. Russ,[1] Nashville, Tennessee, for the appellant, Donald Peden.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Davidson County Criminal Court jury convicted the petitioner of one count each of attempted first degree murder and theft of property valued at $500 or less, and the trial court imposed an effective sentence of 60 years' incarceration. *State v. Donald Peden*, No. M2015-01252-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App.,

_____

[1] Post-conviction counsel was appointed to represent the petitioner in this post-conviction proceeding. He also represented the petitioner on direct appeal by an agreed order for substitution of appointed counsel.

Nashville, Sept. 19, 2016).  The evidence at trial showed that on the morning of September 20, 2012, the victim's 12-year-old daughter found the victim unconscious and bleeding on the bathroom floor.  *Id.*, slip op. at 4.  A paramedic responded to the scene and "found the victim lying face-down with an apparent head wound . . . [and] a laceration across her entire neck."  *Id.*  A responding police officer saw "'blood on the couch, on the rug, . . . a plastic mat . . . that was full of feces and blood[,] . . . [and] blood on the wall, blood on the ground, and blood on the door.'"  *Id.*, slip op. at 6.  Officers recovered a sledgehammer and a knife from the residence, both of which were determined to have traces of the victim's blood.  *Id.*, slip op. at 8.  Later that same day, the petitioner, who was the victim's live-in boyfriend, was arrested for driving under the influence in Giles County and was wearing socks, a shirt, and shoes that were stained with the victim's blood.  *Id.*, slip op. at 2, 4, 8.  The victim's blood was also found in fabric swatches taken from the white Mercury Sable that the petitioner had been driving.  *Id.*

In finding the evidence sufficient to support the petitioner's convictions, this court stated:

> In this case, a knife and a small sledgehammer, both with bloodstains matching the victim's DNA profile, were discovered in the living room next to the victim's diary.  The last entry of the diary . . . was dated September 19, 2012, and reflected that the victim suspected [the petitioner] of using drugs and intended to end her relationship with [him] and ask him to move out.  The victim testified that the diary "shouldn't have been [on the sofa]," and that she always kept the diary either in her nightstand or under her pillow.  Under these circumstances, a jury could reasonably conclude that [the petitioner] arrived home after the victim and her daughters were asleep, got into a confrontation with the victim, and attempted to kill her using both the knife and the sledgehammer.  Believing he had accomplished his task, he left in the victim's white Mercury Sable before getting into an accident, at which point he was arrested wearing a shirt, socks, and shoes that were all stained with the victim's blood.

*Id.*, slip op. at 13 (third alteration in original).

In his amended petition for post-conviction relief,[2] the petitioner alleged the ineffective assistance of trial counsel. In his second amended petition for post-conviction relief, the petitioner alleged, among other things, that his trial counsel performed deficiently by failing to move to suppress or adequately argue for the suppression of certain evidence, failing to challenge the validity of a search warrant, and failing to seek additional testing of certain DNA evidence.

At the evidentiary hearing, the petitioner testified that, at the time of the offense, he shared a residence with the victim and her children. The petitioner stated that a 9-1-1 call was placed at 6:30 a.m. on the morning that the victim was found bleeding. Police responded to the residence between 7:00 and 7:30 a.m., and the warrant for the search of the residence was signed by a general sessions judge at 9:45 a.m. that day. Crime scene logs showed that several police officers entered the scene at 7:26, 7:47, and 8:05 a.m. The petitioner contended that the officers found the knife, sledgehammer, journal, and a cellular telephone in the residence before obtaining a search warrant and that trial counsel failed to moved to suppress those items. The petitioner asserted that he could have achieved a more favorable outcome at trial had those items been excluded.

The petitioner testified that, during his interview with police officers at the Giles County Jail, officers noticed blood on the petitioner's socks and told the petitioner that they would get the socks from him one way or another. The petitioner then gave the officers his socks believing that they would have otherwise taken them from him. The petitioner acknowledged that the blood on his socks was determined to be the victim's blood. During that same interview, officers collected blood evidence from the petitioner's thumb. The petitioner acknowledged that trial counsel had sought to suppress the socks and the blood from his thumb on Fifth and Sixth Amendment grounds, but the petitioner asserted that trial counsel should have also raised a Fourth Amendment violation in the collection of those items.

The petitioner noted that blood evidence was recovered from the inside of his vehicle but stated that the DNA tests were inconclusive as to the contributor of the blood. The petitioner acknowledged that trial counsel sought suppression of the evidence recovered from the vehicle on Fifth and Sixth Amendment grounds, but the petitioner again asserted that trial counsel should have raised a Fourth Amendment violation.

The petitioner acknowledged that the police obtained a search warrant from Giles County for the petitioner's clothing that he was wearing at the time of his arrest and for a sample of the petitioner's DNA. The petitioner stated that Detective Michael

---

[2] The petitioner's original petition for post-conviction relief is not contained in the record.

Bennett's affidavit of probable cause in the Giles County search warrant stated that the victim had identified the petitioner as the perpetrator; the petitioner contended, however, that the victim had identified Bubba Braden as the perpetrator, and, although officers tried to get the victim to say that the petitioner and Bubba Braden were the same person, the victim never identified the petitioner as Bubba Braden. The petitioner's clothing that was collected pursuant to the Giles County warrant was found to contain the victim's blood, and the petitioner asserted that he would have benefitted from the exclusion of those articles of clothing at trial.

The petitioner stated that the DNA testing of at least one piece of evidence excluded the petitioner. The petitioner asked trial counsel to seek additional testing of that item to identify the DNA contributor, but trial counsel "just kept saying that I wasn't excluded, it was inconclusive" and that additional testing was unnecessary.

During cross-examination, the petitioner explained that the crime scene included areas outside of the residence including the porch and sidewalk leading to the front door. The petitioner acknowledged that Officer Charles Linville's supplemental report indicated that prior to obtaining the search warrant, Officer Linville only walked through the residence and made observations. The petitioner stated that Detective Adam Weeks was also present at the crime scene before the search warrant issued, but the petitioner acknowledged that he had no evidence that Detective Weeks searched or collected any evidence prior to obtaining the warrant.

The petitioner acknowledged that he gave his socks to a detective, but he asserted that he was intoxicated at the time and that he did not have an independent memory of the encounter. The petitioner recalled that trial counsel filed "another petition or motion" related to the October 1, 2014 suppression hearing, but the petitioner did not know what issues trial counsel raised in that filing.

The petitioner further acknowledged that trial counsel had "addressed the legality of the Metro [Nashville] Police towing the vehicle from Giles County to Nashville" and that he had a hearing on the issue, but the petitioner maintained that trial counsel nonetheless failed to sufficiently argue that the police lacked probable cause to tow the vehicle.

The petitioner reiterated that, when interviewed by police at the hospital, the victim had identified Bubba Braden as the person who attacked her. The petitioner acknowledged, however, that the victim then said that Bubba Braden and the petitioner were the same person. He also acknowledged that when an officer showed the victim a photograph of the petitioner, the victim identified the petitioner as the person who

-4-

attacked her. Despite the victim's statements to police and despite the petitioner's acknowledging that the victim identified him and Bubba Braden as "[t]wo and the same," the petitioner maintained that the victim never identified him as the perpetrator and that the warrant for the petitioner's clothing and a DNA sample was based on an untrue statement of probable cause. The warrant was executed on the petitioner while he was in custody at the Giles County jail. The petitioner acknowledged that he lived with the victim at the time of the attack and that he and the victim had been having difficulties in their relationship.

Regarding DNA testing, the petitioner explained that he wanted trial counsel to "[r]un it through CODIS" to search for a match to a Bubba Braden or to develop another suspect.

During redirect examination, the petitioner contended that several police officers searched the residence before the search warrant issued. The petitioner also stated that had additional DNA testing revealed Bubba Braden or another person as the contributor of the DNA, such information would have bolstered his defense at trial.

Upon questioning by the court, the petitioner acknowledged that additional testing of the DNA found on the sledgehammer could have further implicated him, but he stated that trial counsel never discussed the possibility of additional testing with him.

Trial counsel testified that he was appointed to represent the petitioner in January of 2014 before the November 2014 trial. The petitioner was previously represented by the public defender's office. Trial counsel recalled meeting with the petitioner at the jail several times, reviewing discovery materials, and listening to the victim's audio-recorded interview with police. Trial counsel described his defense strategy as raising the victim's identifying Bubba Braden as the perpetrator and the police officers' focusing solely on the petitioner and failing to investigate Bubba Braden.

Trial counsel stated that he moved to suppress certain evidence on Fifth and Sixth Amendment grounds, and he later filed an amended suppression motion to include a Fourth Amendment argument. Counsel acknowledged that he did not seek to suppress the evidence found in the search of the residence, stating, "[I]f I would have looked over it and thought that it had merit, I would have" filed such a motion. Trial counsel relied on the police reports and statements from the officers in making his determination to not move to suppress the results of the search of the residence. He agreed that the police reports established that the police walked through the residence first, then obtained a search warrant before conducting a thorough search. Trial counsel noted that whether the police conducted an illegal search of the residence depended on several factors.

Trial counsel stated that the results of one DNA test excluded the defendant and that he cross-examined the witness about that test. Based on the witness' testimony that the DNA sample had not been run through CODIS to search for another DNA match, trial counsel argued that the police developed tunnel vision of the petitioner as the perpetrator and that they failed to conduct a sufficient investigation. Counsel said that his decision to not seek additional testing was strategic, stating, "I don't think it was going to come back to Bubba Braden and, you know, I don't know who it was going to come back to, but that's kind of like one of those things where, you know, you might not necessarily want to get that answer." Trial counsel further explained that if the DNA sample had come back to a TBI lab employee, he would no longer be able to "argue that it could be Bubba Braden's" DNA.

Trial counsel testified that he moved to suppress the petitioner's socks and other clothing based on Fifth and Sixth Amendment violations, but he acknowledged that he did not challenge Detective Bennett's statements of probable cause in the search warrant "because I think they were [made] in the honest belief."

During cross-examination, trial counsel acknowledged that he did not move to suppress the collection of the petitioner's DNA or clothing that had been placed into property at the Giles County jail, which was collected pursuant to a search warrant. Trial counsel stated that the victim identified the petitioner in her interview with police although "it was almost like [the officers] were forcing her to say Bubba Braden is [the petitioner]." Trial counsel said that filing a *Franks* motion to challenge Detective Bennett's statement of probable cause in the warrant "never crossed [his] mind." Regarding the collection of the petitioner's socks and the collection of the blood from the petitioner's thumb, trial counsel stated that his "bigger argument" for suppression centered on a violation of the petitioner's right to counsel.

Trial counsel stated that it was apparent that police officers entered the residence and "looked around" prior to obtaining a search warrant. Counsel said that he did not consider moving to suppress the evidence from the search of the residence, saying, "[S]hould I have filed it, yeah, I don't know, maybe. I don't know what the outcome would have been." Counsel acknowledged that he did not research the doctrine of inevitable discovery or consider whether the search warrant for the residence was overbroad. Trial counsel conceded that excluding the evidence recovered from the residence would have been beneficial to the petitioner's defense.

Regarding the search and seizure of the petitioner's vehicle, trial counsel recalled that he argued that the vehicle was illegally towed because the search warrant

was obtained from Davidson County when the vehicle was located in Giles County. Counsel also argued that "if the [petitioner's] statement was illegally obtained," then "the search warrant for the car" based on that statement was invalid.

Trial counsel acknowledged that, had additional testing of the DNA come back to a specific person who lacked an alibi, "obviously that's going to be incredibly beneficial" to the petitioner's case, but counsel reiterated that the risk of the DNA coming back to a TBI lab technician or another person with an alibi would weaken his defense. Trial counsel acknowledged that despite the results of additional DNA testing, he still would have been able to argue that the victim had identified Bubba Braden as the perpetrator of the attack.

The petitioner's father, Donald Peden, Sr., testified to issues not relevant to this appeal.

As relevant to this appeal, in its written order denying post-conviction relief, the post-conviction court found that trial counsel did not attempt to suppress evidence seized from the residence but that there was no evidence that officers had collected the evidence prior to obtaining the search warrant. Furthermore, the court found that the officers did not rely on anything found during the walkthrough of the residence in securing a search warrant. The post-conviction court found that trial counsel sought to suppress the petitioner's socks and the swabs taken from the petitioner's fingers after he requested counsel, but the court concluded that the merits of the motion to suppress were determined on direct appeal. As to the evidence collected from the petitioner's vehicle, the post-conviction court found that trial counsel had moved to suppress that evidence on the ground that the vehicle was unlawfully seized. The post-conviction court found that trial counsel did not lodge a *Franks* objection to the warrant obtained to collect the petitioner's clothing and DNA sample; however, the court concluded that, because the petitioner failed to present the warrant at the post-conviction hearing, the court could not determine whether the warrant was defective. Finally, the post-conviction court found that trial counsel's decision to not seek additional testing of the DNA found on the sledgehammer was strategic "in an effort to preserve all possible defenses in the case." Furthermore, the court concluded that the petitioner failed to show that further testing would have provided favorable results.

In this timely appeal, the petitioner argues that trial counsel performed deficiently by failing to seek suppression of evidence found during the warrantless search of the residence, failing to seek suppression of evidence taken from the petitioner during his interrogation at the Giles County jail on Fourth Amendment grounds, failing to seek suppression of the search and seizure of the petitioner's vehicle on Fourth Amendment

grounds, failing to challenge the Giles County search warrant for the petitioner's clothing and DNA samples, and failing to seek additional testing of certain DNA evidence.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

We note that a post-conviction petitioner has no constitutional right to counsel, *see Frazier v. State*, 303 S.W.3d 674, 680 (Tenn. 2010); however, the post-conviction petitioner is afforded a statutory right to counsel, *see* T.C.A. § 40-30-107(b)(1); *Frazier*, 303 S.W.3d at 680. Although "performance of post-conviction counsel is not governed by the standard set forth in *Strickland*," *Frazier*, 303 S.W.3d at 682, a post-conviction petitioner has "the right to be represented by conflict-free counsel," *id.* (quoting *Kevin Burns v. State*, No. W2000-02871-CCA-R9-PD, slip op. at 5 (Tenn. Crim. App., Jackson, Aug. 9, 2001)). The role of post-conviction counsel is "not to protect [petitioners] from the prosecutorial forces of the State, but to shape their complaints into the proper legal form and to present those complaints to the court." *Frazier*, 303 S.W.3d at 682 (quoting *People v. Owens*, 564 N.E.2d 1184, 1190 (Ill. 1990)). Though post-conviction counsel's role differs from that of trial counsel, "[i]f post-conviction counsel is appointed to mold the defendant's allegations into legally cognizable shapes, that counsel must be as conflict-free as trial counsel." *Frazier*, 303 S.W.3d at 681 (quoting *People v. Hardin*, 840 N.E.2d 1205, 1212 (Ill. 2005)). Post-conviction counsel "with an actual conflict of interest is subject to disqualification." *McCullough v. State*, 144 S.W.3d 382, 386 (Tenn. Crim. App. 2003) (citing *State v. Tate*, 925 S.W.2d 548, 553 (Tenn. Crim. App. 1995)).

A conflict of interest exists when "an attorney is placed in a position of divided loyalties." *McCullough*, 144 S.W.3d at 385 (citing *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000)). Such divided loyalties arise when an attorney who represented a petitioner on direct appeal also serves as that petitioner's post-conviction counsel. *Frazier*, 303 S.W.3d at 682-83; *McCullough*, 144 S.W.3d at 385 (stating that when post-

-8-

conviction counsel had previously served as the petitioner's counsel on direct appeal "it is reasonable to anticipate that [counsel's] financial, business and/or personal interests may affect his professional judgment insofar as advising the [petitioner] about any possible ineffectiveness on his part with respect to the direct appeal"); *see also* Tenn. Sup. Ct. R. 8, RPC 1.7(2) ("A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer."). As our supreme court has stated, "[C]ounsel representing a post-conviction petitioner can hardly be expected to objectively evaluate his or her performance on the direct appeal of a conviction and sentence." *Frazier*, 303 S.W.3d at 683 (citing *Velarde v. United States*, 972 F.2d 826, 827 (7th Cir. 1992)).

In addition to an attorney's "obligation to avoid ethical violations in their practice of law," "courts have an independent duty to ensure that all proceedings are conducted within the ethical standards of the profession and are 'fair to all who observe.'" *Frazier*, 303 S.W.3d at 683 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988); and citing *Cuyler v. Sullivan*, 446 U.S. 335, 346-47 (1980)). "When, therefore, the [post-conviction] court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken." *Frazier*, 303 S.W.3d at 683 (citing *Sullivan*, 446 U.S. at 346-47). The post-conviction court has an affirmative "duty to either disqualify counsel with an actual conflict of interest or, as an alternative to disqualification, assure that a post-conviction petitioner has knowingly and voluntarily waived the conflict." *Frazier*, 303 S.W.3d at 679-80. Our supreme court has provided the following guidelines a post-conviction court should follow to ensure that a petitioner's waiver of the conflict of interest is knowing and voluntary:

> [The p]etitioner should (1) be brought into open court, (2) be given a full explanation on the record how this matter would affect him; (3) be advised of his right to appointment of other counsel; (4) be questioned under oath by the parties and the post-conviction court to determine his understanding of this matter and waiver; and (5) state under oath whether he desires to waive any appearance of impropriety.

*Frazier*, 303 S.W.3d at 684 (quoting *Burns*, slip op. at 8). If the petitioner makes "a knowing and voluntary waiver of the conflict of interest that is satisfactory to the [post-conviction] court," then "[c]ounsel may continue representation." *Frazier*, 303 S.W.3d at 684-85. Absent the petitioner's valid waiver of the conflict, however, the post-conviction court must disqualify post-conviction counsel and appoint conflict-free counsel. *Id.*

Because post-conviction counsel here was also the petitioner's counsel on the direct appeal of the underlying convictions, the post-conviction court should have either disqualified counsel and appointed a conflict-free attorney or conducted a hearing to advise the petitioner of the conflict and to give the petitioner an opportunity to waive the conflict. From the record, it does not appear that such a proceeding occurred.

Furthermore, several matters in this case raise specific concerns regarding post-conviction counsel's conflict of interest. The petitioner's original pro se post-conviction petition is omitted from the record, which precludes our determining whether the petitioner initially intended to raise a claim of ineffective assistance of appellate counsel. Additionally, post-conviction counsel moved to withdraw from representation on April 6, 2018, stating that the petitioner was "unsatisfied with [c]ounsel's performance and drafting of the [amended] petition" and that the petitioner "would be better served with new counsel that he finds more trustworthy." The motion to withdraw was stricken less than two weeks later, but the record does not indicate a reason. Finally, the petitioner has asserted an ineffective assistance of counsel claim related to trial counsel's failure to raise Fourth Amendment issues in moving to suppress certain evidence. The record reveals that the trial court ruled on certain Fourth Amendment claims in its denial of the petitioner's suppression motion but that the petitioner raised only one Fourth Amendment claim on direct appeal. In its brief, the State raises the petitioner's failure to assert a Fourth Amendment claim as to the socks and thumb swab on direct appeal, noting that if error attended the matter, it was an error of appellate counsel and not trial counsel. Therefore, if the post-conviction court seeks to obtain from the petitioner a waiver of counsel's conflict of interest, it should be certain to ascertain whether the petitioner understands that he could have potential claims against appellate counsel but that his current post-conviction counsel cannot "be expected to objectively evaluate his . . . own performance on the direct appeal." *See Frazier*, 303 S.W.3d at 683.

Accordingly, we vacate the post-conviction court's judgment and remand to that court for a determination of whether the petitioner knowingly and voluntarily agrees to waive the conflict of interest. If the petitioner does not agree to waive the conflict of interest, the post-conviction "court should appoint counsel, permit any amendments to the petition, and consider all potential grounds for relief." *Frazier*, 303 S.W.3d at 685.

This opinion and judgment ends this appeal. *See Born Again Church & Christian Outreach Ministries, Inc. v. Myler Church Bldg. Sys. of the Midsouth, Inc.*, 266 S.W.3d 421, 425-26 (Tenn. Ct. App. 2007) ("Once the mandate reinvests the trial court's jurisdiction over a case, the case stands in the same posture it did before the appeal except insofar as the trial court's judgment has been changed or modified by the appellate

court.") (quoting *Clark Matthew Earls v. Shirley Ann Earls*, No. M1999-00035-COA-R3-CV, slip op. at 4 (Tenn. Ct. App., Nashville, May 14, 2001))).

_____
JAMES CURWOOD WITT, JR., JUDGE